IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Criminal No. *1:05 CR 248* |
| | § | Violations: 18 U.S.C. §371 (Conspiracy to |
| | § | Violate the Federal Securities Laws) |
| JOHN HOULDSWORTH | § | |

## INFORMATION

The United States Attorney charges:

## COUNT ONE
### (Conspiracy to Violate the Federal Securities Laws)

Introduction

At all times relevant to this Information:

     1.     American International Group, Inc. ("AIG") was a Delaware corporation with its

principal place of business in New York, New York. AIG's stock was traded publicly on the

New York Stock Exchange, a national securities exchange. As a publicly traded company, AIG

and its directors, officers and employees were required to comply with the federal securities laws

and regulations, which were designed to ensure that the financial information of publicly traded

companies is accurately recorded and disclosed to the investing public. AIG was in the insurance

and financial services business. Two of the member companies, or divisions, of AIG were:

National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("NUFIC") and Hartford

Steam Boiler Inspection and Insurance Company of Hartford, Connecticut ("HSB"). AIG and

these related companies are collectively referred to herein as AIG.



2.      General Re Corporation ("General Re") was a Connecticut-based company and a subsidiary of Berkshire Hathaway, Inc. ("Berkshire"), which was a Delaware corporation with its principal place of business in Omaha, Nebraska. Berkshire's stock was traded publicly on the New York Stock Exchange, a national securities exchange. As a publicly traded company, Berkshire and its directors, officers and employees were required to comply with the federal securities laws and regulations. General Re was a subsidiary of Berkshire, and its financial information was consolidated into Berkshire's financial reports, and the directors, officers and employees of General Re were also required to comply with the federal securities laws and regulations. General Re was a holding company for global reinsurance and related risk operations. As a holding company, General Re owned General Reinsurance Corporation and held a controlling interest in Kölnische Rückversicherungs-Gesellschaft AG ("Cologne Re"), which had a subsidiary in Dublin, Ireland known as Cologne Re Dublin ("CRD"). Together, General Re and Cologne Re conducted business as Gen Re. Gen Re and its related companies are collectively referred to herein as Gen Re.

3.      The defendant JOHN HOULDSWORTH, was a resident of Ireland and the Chief Executive Officer at CRD from approximately May 1990 until approximately June 2001. Additionally, HOULDSWORTH was the Chief Underwriter of a Gen Re business unit called Alternative Solutions from approximately 1998 until approximately 2004. HOULDSWORTH was licensed as a Chartered Accountant in England and worked for a portion of the relevant time at Gen Re's Stamford, Connecticut headquarters.

4.      HOULDSWORTH's coconspirators included senior level executives at AIG and Gen Re.

2

Background of the Sham Reserve Transactions

5.    On or about October 26, 2000, AIG released publicly its financial results for the third quarter period ended September 30, 2000. Following that release, AIG's stock price dropped 6 percent (down $6.06 to $93.31) and a number of stock market analysts issued reports on AIG which noted that AIG had reduced reserves by approximately $59 million in order to increase earnings per share in that third quarter. At least two analysts downgraded AIG and one analyst expressed concern that AIG had been "releasing reserves to make its numbers" while another wrote that "a steady trend of unexplained [reserve] releases during a period of premium growth . . ." would be a cause for concern.

6.    Within days of AIG's stock price drop and the analysts reports, AIG's Chief Executive Officer ("CEO") asked Gen Re's CEO to lend AIG up to $500 million in reserves on a short-term basis without actually transferring any risk to AIG. Senior level executives at both companies subsequently agreed to structure sham transactions so that AIG could book and report $500 million in phony reserves and premiums. A series of fraudulent transactions followed in which the transaction documents made it appear that Gen Re had: (i) transferred to AIG approximately $500 million in reinsurance risk, along with approximately $500 million in premiums; (ii) paid AIG a $10 million loss transfer payment; and (iii) asked AIG to do this deal. In reality, none of this was true. First, the transactions involved no real reinsurance risk transfer from Gen Re to AIG. Second, pursuant to a secret side deal, AIG actually paid Gen Re $15.2 million – a $5 million fee (plus interest) for doing the deal and a $10 million advance so that Gen Re could then return a $10 million loss transfer payment to AIG as "required" under the sham contracts. Third, Gen Re sent AIG a false solicitation letter in order to create a fake "paper trail"

3

suggesting that Gen Re asked AIG to do this deal, when in fact AIG had asked Gen Re to enter into the transaction.

7.     On March 30, 2005, AIG issued a press release admitting that the accounting for these transactions was improper "in light of the lack of evidence of risk transfer" and would be restated.  Under relevant accounting principles applicable to the sham "reserve" transaction between AIG and Gen Re, AIG was entitled to record reserves in the amount of the loss that was probable and reasonably estimable.  However, AIG was not entitled to record any reinsurance reserves from these transactions because the contracts had no true economic substance and no real risk was passed.  In fact, AIG paid Gen Re $5.2 million for helping it improperly report $500 million in reserves.  On or about May 31, 2005, AIG filed its 2004 Form10-K with the Securities and Exchange Commission ("SEC") which included the following statement concerning the Gen Re transaction: "AIG has concluded that the transaction was done to accomplish a desired accounting result and did not entail sufficient qualifying risk transfer.  As a result, AIG has determined that the transaction should not have been recorded as insurance.  AIG's restated financial statements recharacterize the transaction as a deposit rather than as insurance."

<u>The Conspiracy</u>

8.     In or about and between October 2000 and December 2001, both dates being approximate and inclusive, within the Eastern District of Virginia and elsewhere, the defendant

JOHN HOULDSWORTH

did knowingly and willfully combine, conspire, confederate, and agree with others, both known and unknown, to commit certain offenses against the United States, namely: (a) willfully making and causing to be made untrue, false and misleading statements of material fact in reports and

4

documents required to be filed by AIG under the Securities Exchange Act of 1934 and the rules and regulations thereunder, and failing to provide such further material information as was necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading, in violation of Title 15 United States Code, Sections 78m(a), 78ff and Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-1 and 240.13a-13; (b) willfully falsifying and causing to be falsified books, records and accounts of AIG, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-1; and (c) willfully making and causing to be made materially false and misleading statements and omitting to state and causing others to omit to state material facts to AIG's outside auditors in connection with the preparation or filing of a document and report required to be filed with the SEC, in violation of Title 15, United States Code, Section 78ff and Title 17, Code of Federal Regulations, Section 240.13b2-2.

Purposes

9.      Among the purposes of the conspiracy were:  to make it appear that Gen Re had transferred approximately $500 million in reinsurance risk to AIG so that AIG could include an additional $250 million in reinsurance reserves on its financial reports for both the fourth quarter of 2000 and the first quarter of 2001; to mislead AIG's auditors by making it appear that Gen Re paid AIG a $10 million loss transfer payment for these sham "reserve" transactions; to mislead AIG's auditors by making it appear that Gen Re had solicited AIG's participation in these transactions; to hide from AIG's auditors the fact that AIG had actually paid Gen Re a $5.2 million fee plus a $10 million advance of the loss transfer payment for these sham "reserve" transactions; to mislead Wall Street analysts and investors into believing that AIG's reserves

were growing; to maintain and increase the market price of AIG stock; and to maintain the

conspirators' status and positions within both companies.

Manner and Means

10.     It was part of the conspiracy that defendant HOULDSWORTH and others

agreed to and did cause AIG to fraudulently and improperly recognize $250 million in reserves

and premiums on its books and records and in its publicly filed financials reports for the fourth

quarter of 2000.

11.     It was part of the conspiracy that defendant HOULDSWORTH and others agreed

to and did cause AIG to fraudulently and improperly recognize an additional $250 million in

reserves and premiums on its books and records and in its publicly filed financials reports for the

first quarter of 2001.

12.     It was part of the conspiracy that defendant HOULDSWORTH and others agreed

to and did falsify books and records of both companies and mislead outside auditors by drafting

contracts that made it appear that Gen Re was paying AIG a loss transfer payment of $10 million,

when in truth and fact AIG prepaid Gen Re that $10 million and paid Gen Re an additional $5.2

million fee for executing the sham "reserve" transaction.

13.     It was part of the conspiracy that defendant HOULDSWORTH and others agreed

to and did falsify books and records of both companies and mislead outside auditors by making it

appear that Gen Re had solicited AIG to undertake the sham transactions when in truth and fact

AIG had solicited Gen Re.

14.     It was part of the conspiracy that defendant HOULDSWORTH and others agreed

to and did mislead auditors and others by entering into transactions that were not economically

6

rational for the purpose of providing a mechanism to transfer secretly $15.2 million to Gen Re from an unrelated transaction with AIG member company HSB that was "commuted" – or terminated – in order to advance the $10 million loss transfer payment to Gen Re and pay Gen Re the promised $5.2 million fee.

15.    It was part of the conspiracy that defendant HOULDSWORTH and others agreed to and did mislead auditors and others by entering into transactions that were not economically rational for the sole purpose of providing a mechanism to transfer secretly $12.6 million from Gen Re to CRD so that CRD could pay NUFIC (AIG) $10 million as "required" under the sham "reserve" contracts and keep the other $2.6 million as fifty-percent of the $5.2 million fee AIG paid Gen Re for the transaction.

16.    It was part of the conspiracy that defendant HOULDSWORTH and others agreed to and did mislead auditors and others by causing CRD to pay NUFIC (AIG) $10 million for the sham "reserve" contracts using money that had been routed from HSB (AIG) through Gen Re to CRD so that it would appear that CRD had used its own money to make the loss transfer payments called for under the sham reserve contracts.

<u>OVERT ACTS</u>

17.    In furtherance of the conspiracy and to effect the objects thereof, within the Eastern District of Virginia and elsewhere, the defendant JOHN HOULDSWORTH and others did commit and cause to be committed the following overt acts, among others:

a.    On or about October 31, 2000, AIG's CEO asked Gen Re's CEO if Gen Re would lend AIG up to $500 million in reserves without transferring risk to AIG.

b.    On or about October 31, 2000, two Gen Re executives discussed how it would be

7

best to keep the Gen Re side of the transaction away from the United States.

     c.     On or about November 1, 2000, a Gen Re Senior Vice President ("SVP") notified other senior Gen Re executives that he confirmed with AIG Vice President of Reinsurance (VP-Reinsurance) that AIG wanted reserve impact from the transaction to address criticism from stock market analysts following its recent reductions in reserves.

     d.     In or about early November 2000, Gen Re's Chief Financial Officer ("CFO") and SVP discussed how the transaction could be structured by transferring deposit liabilities from CRD to AIG, that the transaction would be non-risk, that executing the transaction in North America would be a problem due to potential regulatory oversight and that CRD did not report to anyone.

     e.     On or about November 13, 2000, Gen Re's CFO called HOULDSWORTH and told him about the transaction.

     f.     On or about November 14, 2000, HOULDSWORTH told a number of his superiors at Cologne Re and in the Alternative Solutions Group that Gen Re's CFO told him that AIG had taken down reserves to increase AIG's third quarter results and wanted to mask their reserve reductions at year-end by borrowing reserves from Gen Re, and that the transaction had to be done outside the United States so that it would not be apparent that Gen Re was accounting for the transaction differently than AIG.

     g.     On or about November 14, 2000, HOULDSWORTH again talked with Gen Re's CFO who told him that AIG did not want to take any risks.  HOULDSWORTH replied that "if there's enough pressure on their end, they'll find ways to cook their books."  Gen Re's CFO told him that Gen Re would be paid by AIG for the transaction and that AIG was not to get any

economic benefit. Gen Re's CFO then stressed the confidential nature of the transaction and confirmed with HOULDSWORTH that the deal would not be reported in any public document in Ireland.

h.    On or about November 15, 2000, HOULDSWORTH emailed a group of senior Gen Re executives, including the CFO and SVP a draft slip, or term sheet, for the deal and a cover email which summarized the issue as "can CRD provide a retrocession contract transferring approx $500M of reserves on a funds w/held basis to the client with the intention that no real risk is transferred." The email also noted that AIG would not be allowed to inspect CRD's records, and that the contract would have to provide AIG a potential upside but that AIG would have to repay any fee plus pay a margin for the transaction.

i.    On or about November 15, 2000, Gen Re's CFO and SVP, and another Gen Re executive, spoke with HOULDSWORTH about his email and draft slip. During this conversation, the participants discussed repeatedly that: there was no risk for AIG in the transaction, that the risk for Gen Re was reputational; the transaction would show AIG getting paid $10 million up front so that AIG could mislead its auditors but that AIG would repay that $10 million plus pay Gen Re a fee; it was AIG who had the "accounting problem;" the contract would appear to credit interest to AIG so that it could pass the auditor's "smell test;" the contract could have $500 million, $600 million, or $700 million in risk because Gen Re was never going to bill AIG for any losses; and, CRD could commute the transaction at any time. Gen Re's CFO commented at one point that "these deals are a little bit like morphine, its very hard to come off of them."

9

j.     On or about November 17, 2000, Gen Re's CEO and SVP discussed the transaction, specifically noting that CRD would be utilized for the transaction; that Gen Re would get a 1% fee; that the transaction would be completed in two tranches, or parts, one in 2000 and one in 2001; that Gen Re needed to figure out how to get back the $10 million fee, or loss transfer payment, that it would appear to pay AIG under the contracts; and that AIG would not bear any real risk from this transaction.

k.     On or about November 17, 2000, Gen Re's SVP sent an email to AIG's VP-Reinsurance and Gen Re's CFO with a copy of the draft slip attached and an overview that said, in part: "As I mentioned this afternoon, [Gen Re's CEO's] discussions with [AIG's CEO] established the following points:

-The Dublin structure outlined below [in attached slip] appears workable.

- You may want to divide the transaction in two parts – one for 2000 and one for 2001.

- The fee to [Gen Re] will be 1% or $5 m[illion].

- We need to work out a mechanism for [Gen Re] to recover the 2% fee advanced to AIG under the agreement.

- You, [AIG's CFO], [Gen Re's CFO] and I have been appointed to work out the details. A point that may not be sufficiently clear in the discussion document is the term of the agreement.  In accordance with our conversations, we anticipate terminating the agreement at 24 months via a commutation."

l.     In or about late November or early December, 2000, Gen Re's CFO and SVP and others met with AIG's CFO, Controller, and VP-Reinsurance at AIG's offices and told them that Gen Re was accounting for this transaction in a way that was different from how AIG

intended to account for it because Gen Re was deposit accounting for the underlying portfolios and AIG intended to account for them as reinsurance.

m.    On or about December 7, 2000, Gen Re's SVP sent an email to HOULDSWORTH and Gen Re's CFO informing them that AIG's VP-Reinsurance had agreed that AIG would proceed as outlined in the draft slip and in accord with the conversations between AIG's CEO and Gen Re's CEO, and that the transaction would be completed in two installments of $250 million each, one in 2000 and one in 2001.

n.    On or about December 7, 2000, Gen Re's SVP told HOULDSWORTH that the AIG CEO had agreed to pay Gen Re a $5 million fee.

o.    On or about December 8, 2000, HOULDSWORTH sent a list of questions to Gen Re's CFO and SVP.

p.    On or about December 8, 2000, HOULDSWORTH discussed the list of questions with Gen Re's CFO and SVP, including how AIG would pay Gen Re back the $10 million through another contract that AIG would "enrich," how AIG might need a "paper trail" offer letter if they want to make it look like a piece of risk business, and whether anyone could determine how CRD had booked the transaction and, if so, whether such a discovery would pose a problem.  In response to that last question, Gen Re's CFO told HOULDSWORTH that "we told AIG that there would not be symmetrical accounting here . . . we told them that was one of the aspects of the deal they had to digest."

q.    On our about December 11, 2000, HOULDSWORTH spoke with a senior Gen Re executive about the reputational risk in the AIG deal and was told that Gen Re's CEO had signed off on it and that it was the CEO's deal.

11

r.    On our about December 11, 2000, Gen Re's SVP told HOULDSWORTH that AIG wanted an offer letter to create a paper trail.  When HOULDSWORTH mentioned that he would put the SVP's name on the letter, the SVP replied, "that way you've really got me on the hook, I'm right there with you" and added that the letter is exactly what ought to be done because then AIG would have something in their files and "everything ought to be pretty clean."

s.    On or about December 12, 2000, Gen Re's SVP reviewed the false offer letter.

t.    On or about December 17, 2000, HOULDSWORTH faxed the false offer letter to AIG's VP-Reinsurance.

u.    During December 2000, HOULDSWORTH and other Gen Re executives drafted a sham contract for half of the "reserve" transaction which provides falsely that CRD (Gen Re) would cede NUFIC (AIG) $250 million in premiums, on a 98% funds withheld basis, and that NUFIC would assume liabilities of up to $600 million.  According to the contract, CRD was to pay the 2% loss transfer payment, or $5 million, to NUFIC within 30 days.

v.    On or about December 28, 2000, HOULDSWORTH asked a senior Gen Re Finite executive "how much cooking goes on" at AIG and was told "they'll do whatever they need to make their numbers look right."

w.    On or about December 28, 2000, HOULDSWORTH spoke with Gen Re's SVP and a senior AIG executive and was told that AIG needed the first half of the transaction to be booked by year-end and that AIG would book it as a top-line entry.

x.    On or about December 28, 2000, AIG's VP-Reinsurance sent HOULDSWORTH an email confirming AIG's participation in the first half of the transaction.

y.      On or about February 8, 2001, AIG issued its fourth quarter 2000 earnings release in which AIG's CEO stated: "AIG had a very good quarter and year. . . . We added $106 million to AIG's general insurance net loss and loss adjustment reserves for the quarter . . . ." The earnings release included $250 million in phony reserves from the sham "reserve" transaction between NUFIC (AIG) and CRD (Gen Re).

z.      On or about February 16, 2001, Gen Re's CFO told HOULDSWORTH that she had spoken to AIG's CFO who said AIG booked the first half of the transaction in 2000.

aa.      On or about February 16, 2001, Gen Re's SVP notified HOULDSWORTH and Gen Re's CFO via email that AIG's CFO and VP-Reinsurance had decided that the most efficient way to transfer funds for the "reserve" transaction to Gen Re would be to commute – or terminate – an unrelated transaction between Gen Re and HSB (AIG) and leave Gen Re with $15 million that it would otherwise not be entitled to. The email also noted that the AIG executives said it was important to book the second part of that transaction in the first quarter of 2001.

bb.      On or about February 21, 2001, Gen Re's SVP notified Gen Re's CEO that the unrelated HSB commutation transaction would be used to fund the payments due under the sham "reserve" transaction, that the second half would be booked by AIG in the first quarter, and that no money had yet changed hands.

cc.      On or about March 8, 2001, HOULDSWORTH sent AIG's VP-Reinsurance a signed copy of the sham contract for the first half of the "reserve" transaction, effective December 1, 2000 – before it was drafted –  which, by its false terms, provides that CRD (Gen Re) will pay NUFIC (AIG) a 2%, or $5 million, loss transfer payment.

13

dd.   On or about April 2, 2001, AIG electronically filed its SEC form 10-K for the period ended December 31, 2000, with the SEC's electronic EDGAR filing system in Alexandria, Virginia, which form included $250 million in phony reserves from the sham transaction with Gen Re.

ee.   On or about April 26, 2001, AIG issued its first quarter 2001 earnings release, in which AIG's CEO stated: "We added $63 million to AIG's general insurance net loss and loss adjustment reserves for the quarter . . . ." The earnings release included an additional $250 million in phony reserves from the "reserve" transaction with Gen Re.

ff.   On or about May 15, 2001, AIG electronically filed its SEC form 10-Q for the period ended March 31, 2001, with the SEC's electronic EDGAR filing system in Alexandria, Virginia, which form included the remaining $250 million in phony reserves from the sham transaction with Gen Re.

gg.   On or about August 21, 2001, Gen Re's SVP sent a letter to AIG's VP-Reinsurance noting that the two stage reserve transfer had been completed and the only remaining issue was the transfer of funds.

hh.   On or about August 28, 2001, AIG's VP-Reinsurance sent HOULDSWORTH a signed copy of the sham contract for the first half of the "reserve" transaction.

ii.   On or about September 6, 2001, a CRD executive sent AIG's VP-Reinsurance a signed copy of the sham contract for the second half of the "reserve" transaction, effective March 31, 2001, which, by its false terms, provides that CRD (Gen Re) would pay NUFIC (AIG) a 2%, or $5 million, loss transfer payment.

jj.    On or about October 2, 2001, AIG's VP-Reinsurance sent a CRD executive a signed copy of the sham contract for the second half of the "reserve" transaction.

kk.    On or about December 18, 2001, a senior Gen Re Finite executive sent an email to a group of Gen Re executives summarizing how the funds from the HSB deal would be used to "lock in $5M intended economics" for Gen Re.  According to the email, Gen Re would pay HSB and NUFIC approximately $15.2 million less than HSB was entitled to receive, then use $10 million of those funds for the loss transfer payment due NUFIC (AIG) on the two halves of the "reserve" transaction, and split the remaining $5.2 million equally between Gen Re and CRD.

ll.    On or about December 21, 2001, Gen Re entered into a commutation with HSB (AIG) for a pre-existing contract under which Gen Re agreed to pay HSB $7.5 million rather than the approximately $32.2 million it owed HSB.

mm.    On or about December 27, 2001, Gen Re executed a retrocession contract with NUFIC (AIG) and paid NUFIC $9.5 million so that NUFIC would reinsure Gen Re for any losses Gen Re was obligated to pay HSB under the contract that had been commuted with HSB six days earlier on December 21, 2000, thereby leaving Gen Re with a balance of approximately $15.2 million of the HSB (AIG) money .

nn.    On or about December 27, 2001, Gen Re entered into a reinsurance contract with CRD whereby CRD paid Gen Re $400,000 to assume $13 million in losses that CRD had already incurred, thereby transferring approximately $12.6 million to CRD and leaving Gen Re with a balance of approximately $2.6 million of the HSB (AIG) money.

15

oo.    On or about December 28, 2001, CRD transferred approximately $10 million to NUFIC, thereby using HSB (AIG) money to pay NUFIC (AIG) the $10 million loss transfer payment due under the two sham "reserve" contracts.

All in violation of Title 18, United States Code, Section 371.

DATED: June 6, 2005

Paul J. McNulty
United States Attorney

Joshua R. Hochberg
Chief, Fraud Section, Criminal Division
U.S. Department of Justice

By: _____
Thomas A. Hanusik
Assistant Chief, Fraud Section

Michael S. Dry
Assistant United States Attorney

A TRUE COPY, TESTE:
CLERK, U.S. DISTRICT COURT

BY _____
DEPUTY CLERK

16