UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------

UNITED STATES OF AMERICA,

Plaintiff,

v.

JOHN HOULDSWORTH,

Defendant.

3:06 Cr. 211 (CFD)

June 2, 2009

-------------------------------------------------

## DEFENDANT JOHN HOULDSWORTH'S
## SENTENCING MEMORANDUM

Larry Byrne, (ct14295)
Lance Croffoot-Suede, (phv01469)
Ulysses S. Smith, (us0127)
LINKLATERS LLP
1345 Avenue of the Americas
New York, NY 10105
Tel.  212 903 9000
Fax  212 903 9100

Alex V. Hernandez (ct08345)
Pullman & Comley, LLC
300 Atlantic Street
Stamford, CT 06901-3522
Tel. 203 674 7952
Fax 203 363 8659
E-Mail: ahernandez@pullcom.com

*Attorneys for Defendant John Houldsworth*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................. iii

I.     PRELIMINARY STATEMENT ................................................................. 1

II.    THE GUIDELINES CALCULATION IS NOT IN DISPUTE ............................ 4

III.   MR. HOULDSWORTH'S BACKGROUND AND EXPERIENCE .................... 5

IV.    MR. HOULDSWORTH SHOULD RECEIVE A NON-CUSTODIAL SENTENCE
       BASED ON HIS SUBSTANTIAL ASSISTANCE TO THE GOVERNMENT ........ 7

       A.     Mr. Houldsworth's Substantial Assistance ................................................. 8

              1.     The Timeliness of Mr. Houldsworth's Assistance ............................... 8

              2.     The Significance and Usefulness of Mr. Houldsworth's Assistance ........ 9

              3.     The Truthfulness, Completeness, and Reliability of Mr. Houldsworth's
                     Information and Testimony ................................................................ 10

                     a)     Mr. Houldsworth's Trial Testimony Was Unassailable ............. 10

                     b)     Information Provided by Mr. Houldsworth ............................. 13

              4.     Consequential Injury Suffered, or Danger or Risk of Injury, to Mr.
                     Houldsworth or His Family ............................................................... 14

       B.     A Departure to a Probationary Sentence and No Fine Is Authorized by the Guidelines
              ........................................................................................................ 16

V.     IF THE COURT IMPOSES A NON-GUIDELINES SENTENCE, A NON-CUSTODIAL
       SENTENCE IS APPROPRIATE .................................................................. 18

       A.     Mr. Houldsworth's Personal History and Characteristics, and the  Characteristics of
              the Offense, Warrant a Non-Custodial Sentence ...................................... 19

              1.     Mr. Houldsworth's Personal History and Characteristics ..................... 20

                     a)     Mr. Houldsworth's Personal History ................................... 20

                     b)     Mr. Houldsworth's Status as a Deportable Alien .................... 25

              2.     Mr. Houldsworth's Acceptance of Responsibility ............................ 29

              3.     Mr. Houldsworth's Substantial Assistance to the Government ............ 29

              4.     The Nature and Characteristics of the LPT Fraud ............................ 30

       B.     A Non-Custodial Sentence Would Promote Respect for the Law, Provide Just
              Punishment, and Satisfy the Needs of General and Specific Deterrence ......... 31

              1.     Promoting Respect for the Law, Rewarding Cooperation, and Providing Just
                     Punishment .................................................................................. 31

        2.    General Deterrence..........................................................................................33

        3.    Specific Deterrence ........................................................................................34

    C.    Probation Is an Available Sentence for Mr. Houldsworth...........................................35

    D.    Sentencing Mr. Houldsworth to a Term of Probation Would Avoid Unwarranted
        Sentencing Disparities ...................................................................................36

    E.    There is No Need to Provide Restitution in this Case ...............................................37

VI.    FINE..............................................................................................................37

    A.    Mr. Houldsworth's Diminished Income, Earning Capacity, and Financial Resources
        Warrant A Sentence of No Fine.......................................................................38

    B.    The Substantial Burden a Fine Would Impose Warrants A Sentence of No Fine......39

    C.    The Fact That Mr. Houldsworth Did Not Personally Profit From the Offense
        Warrants A Sentence of No Fine.....................................................................39

    D.    The Savings Obtained by the Government As a Result of Mr. Houldsworth's
        Cooperation Warrants A Sentence of No Fine .........................................................39

VII.  CONCLUSION ..................................................................................................40

## TABLE OF AUTHORITIES

### FEDERAL CASES

Gall v. United States,
128 S.Ct. 586 (2007) ..............................................................................18, 33, 36

Kimbrough v. United States,
128 S.Ct. 558 (2007)..............................................................................18, 19, 31

Rita v. United States,
127 S.Ct. 2456 (2007)....................................................................................18

Simon v. United States,
361 F.Supp.2d 35 (E.D.N.Y. 2005) .................................................................34

United States v. Bakeas,
987 F. Supp. 44 (D. Mass. 1997) ...................................................................27

United States v. BCCI Holdings, S.A.,
3 F.Supp.2d 31 (D.D.C. 1998)........................................................................40

United States v. Boscarino,
437 F.3d 634 (2d Cir. 2006) ...........................................................................32

United States v. Cubillos,
91 F.3d 1342 (9th Cir. 1996) .....................................................................26, 27

United States v. Davoudi,
172 F.3d 1130 (9th Cir. 1999) .........................................................................27

United States v. DeRiggi,
893 F. Supp. 171 (E.D.N.Y. 1995) ..................................................................40

United States v. Farouil,
124 F.3d 838 (7th Cir. 1997) ...........................................................................27

United States v. Forchette,
220 F.Supp.2d 914 (E.D. Wis. 2002) ..............................................................30

United States v. Gardellini,
545 F.3d 1089, 2008 WL 4889971 (D.C. Cir. Nov. 14, 2008)...........................18

United States v. John Doe,
79 F.3d 1309 (2d Cir. 1996) ...........................................................................32

United States v. Jones,
531 F.3d 163 (2d Cir. 2008) .......................................................................................18

United States v. Losovsky,
571 F.Supp.2d 545 (S.D.N.Y. 2008) ......................................................................8, 14

United States v. Myers,
353 F.Supp.2d 1026 (S.D. Iowa 2005) .....................................................................31

United States v. Restrepo,
999 F.2d 640 (2d Cir. 1993) .....................................................................................27

United States v. Tanellus,
201 F.3d 439, 1999 WL 1008982 (4th Cir. Nov. 8, 1999) ........................................27

## DOCKETED CASES

United States v. Adelson,
2008 WL 5155341 (2d Cir. Dec. 9, 2008)...............................................................18, 33

United States v. Alatsas,
No. 06-CR-473, 2008 WL 238559 (E.D.N.Y. Jan. 16, 2008)..........................................29

United States v. Carmona-Rodriguez,
No. 04 CR.667, 2005 WL 840464 (S.D.N.Y. Apr. 11, 2005)..........................................34

United States v. Faiella,
No. 06-CR-335, 2008 WL 4862455 (E.D.N.Y. Sept. 8, 2008) ........................................17

United States v. Hernandez,
No. 03 CR. 1257, 2005 WL 1242344 (S.D.N.Y. May 24, 2005)......................................34

United States v. Kee,
No. 04 CR. 271, 2005 WL 1162449 (S.D.N.Y. May 13, 2005).......................................34

United States v. Livesay,
03-CR-182 (N.D. Ala. July 16, 2007) ............................................................................17

United States v. McKillop,
No. 06-CR-336, 2008 WL 4862381 (E.D.N.Y. Sept. 8, 2008) ..................................16, 29

United States v. Miller,
No. 2:07-cr-90-FTM-29SPC, 2008 WL 697359 (M.D. Fla. Mar. 13, 2008) ....................29

United States v. Morrison,
Nos. 92-10121, 1993 WL 59331 (9th Cir. March 5, 1993)................................38

United States v. Munir,
No. 98 CR 60, 1999 WL 1140865 (S.D.N.Y. Dec. 13, 1999)...........................17

United States v. Normand,
02 Cr. 1341 (S.D.N.Y. Aug. 5, 2005)........................................................17, 38

United States v. Roberts,
No. Crim. 01-25101, 2002 WL 32341803 (E.D. Pa. Mar. 4, 2002)..................28

United States v. Smith,
No. 06-CR-173, 2008 WL 4662346 (E.D.N.Y. Oct. 28, 2008),.................16, 29

United States v. Springer,
No. 06-CR-334, 2008 WL 4867883 (E.D.N.Y. Sept. 8, 2008) .........................17

United States v. Wright,
No. 3:CR-04-100, 2008 WL 4722508 (M.D.Pa. Oct. 23, 2008) .......................29

## FEDERAL STATUTES

18 U.S.C. § 1227 .................................................................................................25

18 U.S.C. § 3553 ............................................................................................passim

18 U.S.C. § 3559 .................................................................................................36

18 U.S.C. § 3561 .................................................................................................36

18 U.S.C. § 3562 .................................................................................................36

18 U.S.C. § 3571 .................................................................................................37

18 U.S.C. § 3572 ...........................................................................................37, 38

18 U.S.C. § 3621 .................................................................................................26

18 U.S.C. § 3624 .................................................................................................26

18 U.S.C. § 3642 .................................................................................................27

18 U.S.C. § 371 ................................................................................4, 5, 25, 36

18 U.S.C. § 4100 .................................................................................................................35

18 U.S.C. § 4102 .................................................................................................................35

U.S.S.G. § 2B1.1 ..........................................................................................................4, 5, 30

U.S.S.G. § 5E1.2...........................................................................................................16, 39

U.S.S.G. § 5G1.1 ...................................................................................................................5

## MISCELLANEOUS

Arthur Beesley, "Guilty plea move results in Cologne Re sacking," Irish Times,
       June 8, 2005.................................................................................................................24

Arthur Beesley, "Cologne Re chief 'created false documents' – US lawsuit," Irish
       Times, May 27, 2005....................................................................................................24

Brad Heath, "Immigration Courts Face Huge Backlog," USA Today, March 29,
       2009 .............................................................................................................................26

Justin O'Brien, "After hubris always comes catastrophe," Irish Times, Feb. 09,
       2009 .............................................................................................................................24

## DEFENDANT JOHN HOULDSWORTH'S
## SENTENCING MEMORANDUM

Defendant, John Houldsworth, by his attorneys, respectfully submits this

Sentencing Memorandum (the "Memorandum") and attached exhibits to assist the Court in

determining his sentence at the hearing currently scheduled for June 16, 2009. For the reasons

set forth below, the defendant respectfully urges the Court to grant the government's anticipated

motion for a downward departure pursuant to United States Sentencing Guidelines (U.S.S.G.)

§ 5K1.1, or to grant the defendant's request for a non-Guidelines sentence, and impose a

sentence of one year probation with no fine.

## I.    PRELIMINARY STATEMENT

On June 16, 2009, this Court will sentence Mr. Houldsworth for his conduct in

connection with the fraudulent Loss Portfolio Transfer (the "LPT") between General

Reinsurance ("Gen Re") and American International Group ("AIG"). This Court has already

recognized the seriousness of the LPT fraud by imposing custodial sentences on Mr.

Houldsworth's co-conspirators, Ronald Ferguson, Christian Milton, Elizabeth Monrad, Robert

Graham, and Christopher Garand, of 2 years, 4 years, 1 and a half years, 1 year and a day, and 1

year and a day, respectively.

On the one hand, Mr. Houldsworth's personal history and characteristics are

similar to that of his co-conspirators in a number of respects: he is a first time offender; he was

not motivated by personal financial gain in participating in the LPT fraud and profited nothing

from it; he is a devoted husband and family man and a valued member of his community; and

there is no chance that he will engage in this type of criminal conduct in the future. It was

principally for these reasons that the Court imposed non-Guidelines sentences on Mr.

Houldsworth's co-conspirators that were substantially below the imprisonment ranges called for by the United States Sentencing Guidelines (the "Guidelines").

On the other hand, Mr. Houldsworth's personal trajectory diverged sharply and irrevocably from that of his co-conspirators in the spring of 2005 when he took personal responsibility for his actions and admitted his mistakes. In his first meeting with the government, he informed the government of the essential elements of the LPT, including the no-risk nature of the transaction, and the various fraudulent payments that resulted in a $5.2 million net payment to Gen Re. He also admitted that the offer letters he had drafted were false and that the LPT was deceptive and wrong.

Shortly after that first meeting, Mr. Houldsworth accepted full responsibility for his actions by pleading guilty to the charges against him. He pled guilty even though he was an English citizen who lived and worked in Ireland and had no concrete ties to the United States, giving him the considerable legal option of forcing the government to attempt to extradite him from Ireland and to try and convict him. Instead, Mr. Houldsworth flew from Ireland to Virginia, and became the first defendant to plead guilty in this case. By pleading guilty, he demonstrated his respect for the law, even though that law was foreign to him.

For the three years between his guilty plea and the end of the trial of his co-conspirators, Mr. Houldsworth provided continual, substantial, and extraordinary assistance to the government in its prosecution of his co-conspirators. The principal form of his cooperation was his lengthy and powerful testimony at trial, which the Court witnessed. That testimony was the culmination of hundreds of hours spent in meetings with the government (which Mr. Houldsworth estimated at the trial accounted for almost 35 days' worth of meetings), and hundreds of additional hours listening to the hundreds of tape recordings made of his

2

conversations. Among other things, Mr. Houldsworth became the government's de facto expert on reinsurance, and specifically finite reinsurance. He labored patiently to explain to the government and the jury the insurance and accounting concepts that were at the core of the government's case, including the limits of those concepts. Mr. Houldsworth also spent hundreds of hours correcting the transcripts of the recordings that the government created, provided to the defense, and used at trial. In essence, Mr. Houldsworth acted as expert and fact witness.

While cooperating, Mr. Houldsworth's primary concern was to present an accurate account of his actions. Mr. Houldsworth always was mindful that he should portray events solely as he remembered them. From his first meeting with the government in 2005 until he left the witness stand in 2008, Mr. Houldsworth portrayed his former colleagues at Gen Re as people who did something they should not have with respect to the LPT, while representatives of those individuals portrayed him during the trial as the sinister cause of their predicament. Mr. Houldsworth's mantra throughout the difficult process was to tell the truth, and to trust that the United States judicial system would fairly and justly judge him and his former colleagues based solely upon the facts.

During the three years Mr. Houldsworth cooperated with the government prior to the trial, he was forced to confront, again and again, the mistakes he had made. He was forced to re-live the decisions that had cost him his job and his good name, that had caused great pain to his family, and that he knew may eventually cost him his freedom. In short, he was forced to examine himself, and the person who emerged from that process of self-examination was the one who appeared at trial – a person with no urge to minimize his role or deflect blame to others.

While Mr. Houldsworth is undoubtedly a good man, as exhibited by the 36 letters submitted to this Court on his behalf by his friends, family, and colleagues,[1] it is principally because of his acceptance of responsibility, his now demonstrated respect for the law, and his extraordinary assistance to the government, that we respectfully request that the Court impose a non-custodial sentence.

If the Court decides to impose a Guidelines sentence, we respectfully submit that a downward departure is appropriate based on Mr. Houldsworth's substantial assistance to the government, and that the Court should impose a probationary sentence. If the Court decides to impose a non-Guidelines sentence, we believe that the same result – a non-custodial sentence – is appropriate. Indeed, the Probation Office, in its presentence report, makes clear that a non-custodial sentence would be appropriate for Mr. Houldsworth. We understand that while the government will not recommend that the Court impose a particular sentence on Mr. Houldsworth, the government is not seeking a term of incarceration. In short, Mr. Houldsworth's life history, his conduct in this case and toward the parties to this proceeding, all support a non-custodial sentence, whether pursuant to a Guidelines departure or to the imposition of a non-Guidelines sentence.

## II.    THE GUIDELINES CALCULATION IS NOT IN DISPUTE

Mr. Houldsworth agrees with the findings of the Probation Office with respect to the Guidelines calculation in the presentence report (as amended) ("PSR"). Absent any departure, Mr. Houldsworth's Guidelines sentence is 60 months. The base offense level for 18 U.S.C. § 371 is found in § 2B1.1 of the Guidelines, which provides for a base offense level of 7. Based on this Court's Ruling on Loss Calculation, Victim Enhancement, and Restitution on

---

[1]    Copies of the letters are attached to this memorandum as Exhibits 1 – 36 and are ordered alphabetically by author's last name.

4

October 31, 2008 (the "October 31 Ruling"), there is a 30 level increase based on a loss of over $400,000,000 under § 2B1.1(b)(1)(P). In addition, based on the Court's October 31 Ruling, a 6 level increase is warranted because the offense involved more than 250 victims pursuant to § 2B1.1(b)(2)(C). Finally, there is an additional 2 level enhancement because the offense involved sophisticated means under § 2B1.1(b)(8)(c). Mr. Houldsworth's acceptance of responsibility entitles him to a reduction of 3 levels under § 3E1.1. Thus, his total offense level is 42.

As a first-time offender, Mr. Houldsworth has no criminal history points, resulting in a Criminal History Category I. Because the intersection of Offense Level 42 and Criminal History Category I yields an imprisonment range which exceeds the statutory maximum 60 month term of imprisonment permitted by 18 U.S.C. § 371, his Guidelines imprisonment range is the statutory maximum, five years. See U.S.S.G. § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized sentence shall be the guidelines sentence.").

## III. MR. HOULDSWORTH'S BACKGROUND AND EXPERIENCE

John Bryan Houldsworth was born on February 9, 1959, in Dartford, England to his parents, Bryan and Margaret Houldsworth.[2] Mr. Houldsworth's father worked as a foreign service officer in the British government, which meant that Mr. Houldsworth and his two younger siblings, David and Sue, spent their childhood in transit, including stops in Nigeria; Uganda; and Rye, New York.

Mr. Houldsworth attended a boarding school in Yorkshire, England, from which he graduated in 1977. He proceeded to study at Liverpool University in Liverpool, England,

---

[2]     Additional information related to Mr. Houldsworth's background and personal characteristics is contained in Section V(A)(1)(a), infra.

5

where he received an undergraduate degree in Commerce, with honors, in 1980. After graduating from Liverpool University, Mr. Houldsworth began his professional life by working as an accountant for Deloitte Haskins (the predecessor of Deloitte Touche Tohmatsu) in Liverpool. In 1983, Mr. Houldsworth became certified as a chartered accountant in England, which is the equivalent of a Certified Public Accountant in the United States. In 1984, he moved to Bermuda to work for KPMG as a senior auditor. In 1988, Cologne Reinsurance ("Cologne Re"), a German reinsurance company, offered him a position as Chief Financial Officer in its four-person Bermuda office.

It was in Bermuda that Mr. Houldsworth met his future wife, Ruth. He married Ruth on June 17, 1988, and the two moved to Dublin, Ireland in 1990 to start a family. In 1990, Cologne Re offered Mr. Houldsworth a position as Chief Executive Officer of a new four-person outpost in Dublin, which became known as Cologne Re (Dublin) or CRD and which grew to be a 25-person operation. In 1998, Mr. Houldsworth also became the Chief Underwriting Officer for Alternative Solutions, a business unit of Cologne Re's corporate parent Gen Re. While in Ireland, Ruth and John were blessed with their three children, Nicholas, age 18, Alice, age 15, and Victoria, age 13. Each of the Houldsworth children attends school in Dublin.

On June 6, 2005, CRD terminated Mr. Houldsworth's employment immediately after it learned that he had entered into a plea agreement in this case. (Trial Tr., Ex. 37, at 2150:5-7.[3]) As the sole financial supporter of the family, however, Mr. Houldsworth was determined to find work to support his family. From August 2005 until December 2005, he worked as a consultant for Trinergy, an Irish firm that builds, manages, and invests in wind farms. In gaining employment with Trinergy, Mr. Houldsworth revealed in full the nature and

---

[3]    Pages excerpted from the transcript of the trial United States of America v. Ronald E. Ferguson, et al., are attached to this memorandum as Exhibit 37.

potential consequences of this criminal proceeding against him in the United States. Trinergy

nevertheless valued Mr. Houldsworth's contributions and allowed him flexibility in his schedule

to travel to the United States to meet with the government repeatedly during his employment.

In December 2005, as a trial of his co-conspirators appeared imminent, Mr.

Houldsworth left his consultancy position with Trinergy and spent just over a year at home with

his family. During this time, he was forced to borrow money from his siblings to cover his

family's living expenses. Despite the financial strain his unemployment caused, Mr.

Houldsworth believed that spending as much time with this family as possible was essential,

especially given his potential incarceration in the United States.

After a year passed and the trial of his co-conspirators continued to be delayed,

Mr. Houldsworth searched for and eventually found employment in April 2007 at Charles

McCann Investments, which is a private company based in Dublin. Currently, Mr. Houldsworth

works as a financial controller for Charles McCann Investments, a wealth management company

devoted to managing the McCann family's private wealth in Dublin. As he did with Trinergy,

Mr. Houldsworth has informed his current employer of the criminal charges pending against him

in the United States. His employer has been very supportive of him during this difficult period,

even allowing him a leave of absence during the weeks he spent in Hartford preparing for, and

testifying in, the trial of his co-conspirators.

## IV.    MR. HOULDSWORTH SHOULD RECEIVE A NON-CUSTODIAL SENTENCE BASED ON HIS SUBSTANTIAL ASSISTANCE TO THE GOVERNMENT

Guidelines Section 5K1.1 provides that when a defendant provides substantial

assistance to the government in the investigation and prosecution of another, the sentencing court

may, upon motion by the government, depart downward from the Guidelines sentencing range.

The defendant anticipates that the government will file a motion for a downward departure

pursuant to Guidelines Section 5K1.1 and respectfully urges the Court to grant the government's motion.

Where, as here, Mr. Houldsworth has provided substantial and exceptional assistance to the government, the defendant respectfully submits that the sentencing court should impose a non-custodial sentence to reflect the defendant's cooperative efforts. In any event, the Court should grant Mr. Houldsworth a significant departure from the Guidelines sentence of five years based on the assistance he has rendered to the government. Cooperation is rewarded by courts because it is vital to the criminal justice system. See United States v. Losovsky, 571 F. Supp. 2d 545, 546-47 (S.D.N.Y. 2008) ("Indisputably, cooperators play a vital role in the Government's law enforcement efforts. Their assistance provides the Government with a powerful means to solve crimes and thereby to promote justice for the offenders, their victims and the larger society.").

For the reasons that follow,[4] the defendant respectfully submits that a non-custodial sentence of one year probation, with no fine,[5] is a wholly appropriate sentence.

### A.     Mr. Houldsworth's Substantial Assistance

#### 1.     The Timeliness of Mr. Houldsworth's Assistance

Mr. Houldsworth was the first defendant in this matter to plead guilty and the first to cooperate.[6] Mr. Houldsworth did so at the earliest possible stage of the investigation, just

---

[4]     Section 5K1.1(a) of the Guidelines sets forth the following five bases upon which a court may decide to reduce a defendant's sentence pursuant to such a motion for a downward departure by the government: (1) the significance and usefulness of the defendant's assistance; (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant; (3) the nature and extent of the defendant's assistance; (4) any injury suffered, or any danger or risk of injury to the defendant or his family; and (5) the timeliness of the defendant's assistance. Guidelines § 5K1.1(a). The order in which these five reasons are discussed below does not reflect the order in which these reasons are laid out in the statute.

[5]     The issue of Mr. Houldsworth's fine is discussed in Section VI below.

[6]     Richard Napier entered a plea agreement on June 7, 2005, several days after Mr. Houldsworth, and pled guilty the day after Mr. Houldsworth, on June 10, 2005.

weeks after being contacted by the government. The fraud in this case was complex and spanned continents. Under the circumstances, it would not have been unreasonable for him and his counsel to delay, dither, or demur when deciding whether to cooperate. Thus, the defendant respectfully submits that the speed with which Mr. Houldsworth renounced his criminal conduct and committed to cooperating with the government supports his request for a non-custodial sentence.

### 2.    The Significance and Usefulness of Mr. Houldsworth's Assistance

The defendant anticipates that the government's 5K1.1 motion and accompanying memorandum will detail the significance and usefulness of Mr. Houldsworth's assistance to the government. However, the defendant offers the following observations.

During his proffer sessions with the government, Mr. Houldsworth provided exceptional assistance to the government in its prosecution of his co-conspirators in a variety of ways. He acted as a de facto expert on insurance, reinsurance, finite insurance, accounting, and related issues. Mr. Houldsworth lent his considerable expertise to government representatives for assistance in determining the appropriate terminology and understanding the terms of the contracts at issue. Mr. Houldsworth also was consulted regarding the proper interpretation of insurance and reinsurance principles. Indeed, the government arguably did not need an expert witness on reinsurance or finite reinsurance to explain loss portfolio transfers, such as the LPT, at trial, because Mr. Houldsworth was able to explain the elements of reinsurance contracts such as the LPT.

As the government witness most familiar with the LPT, Mr. Houldsworth provided invaluable assistance to the government by explaining its terms and features. Just as important, Mr. Houldsworth explained the six reinsurance transactions underlying the LPT, which were listed on "Schedule A" to the LPT. Each of these transactions was itself much more

9

complicated than the LPT. Mr. Houldsworth assisted the government in coming to a full

understanding of some of these transactions. Mr. Houldsworth also assisted the government in

establishing that the LPT did not result in the transfer of real risk from Gen Re to AIG. By

demonstrating for the government how and why the six underlying reinsurance contracts, as

transferred to AIG through the LPT, did not contain adequate risk to meet the accounting

requirements for risk transfer, Mr. Houldsworth helped the government establish a fundamental

element of its case – that the LPT did not transfer risk to AIG. Indeed, despite the complex

nature of the underlying transactions to the LPT, the defense at trial was not able to cast doubt

upon Mr. Houldsworth's explanation of why the LPT could not have transferred real risk to AIG.

When Mr. Houldsworth was not meeting with the government in the United

States, he was still providing valuable cooperation. While at home in Ireland, he devoted

countless days to listening to the hundreds of tape recordings made of his conversations, both to

refresh his recollection in anticipation of his trial testimony and in response to specific questions

from the government. In addition, he spent hundreds of hours correcting, line by line, the

transcripts of the tape recordings that the government created, provided to the defense, and

ultimately used at trial.

The principal form of Mr. Houldsworth's cooperation, however, was the truthful,

complete, and thoroughly reliable testimony he gave during eight days of trial, which the Court

witnessed.

> **3. The Truthfulness, Completeness, and Reliability of Mr. Houldsworth's Information and Testimony**
>
> > **a) Mr. Houldsworth's Trial Testimony Was Unassailable**

The jury's verdicts finding each of the trial defendants guilty beyond a reasonable

doubt of a complex international fraud bear witness to the truthfulness, completeness, and

reliability of Mr. Houldsworth's testimony – testimony that was aggressively cross-examined by many experienced trial counsel.

Without reciting all of Mr. Houldsworth's important testimony, we draw the Court's attention to a number of the key attributes of his testimony.

First, Mr. Houldsworth's testimony was entirely truthful and was fully corroborated by the contemporaneous recordings of his telephone conversations, by business records and other documents, and by the testimony of other trial witnesses. Notably, he hid nothing and protected no one, including himself. Both on direct and cross-examination, he admitted that his actions in connection with the LPT were wrong and illegal. (Trial Tr., Ex. 37, at 2250-51.)

Second, Mr. Houldsworth's testimony established, in a precise and unwavering form, many of the essential facts that the government needed to prove its case at trial.

- The defendants and other co-conspirators structured a deal, undertaken through two contracts, through which AIG appeared to reinsure Gen Re. (Trial Tr., Ex. 37, at 2143-45.)

- The deal appeared to provide for AIG to reinsure Gen Re for up to $600 million in limit of liability in exchange for $500 million of premiums. (Trial Tr., Ex. 37, at 2144.)

- AIG appeared to take on $100 million in risk through the deal; in fact, however, there was no risk transferred to AIG. (Trial Tr., Ex. 37, at 2256, 2284, 2292-93.)

- The LPT itself had no financial benefit to Gen Re, but, through a separate, secret side deal, AIG paid Gen Re $5 million to undertake the transaction and repaid Gen Re for the $10 million in premium it paid under the written contracts. (Trial Tr., Ex. 37, at 2144-45:25-2 (". . . the $10 million we were going to pay AIG, we would have to get that paid back plus an actual fee for doing the deal."), 2253-56.)

- In addition to the fact that the LPT contained no risk, Gen Re and AIG struck a secret side deal that rendered the LPT no-risk for AIG. Mr. Houldsworth testified that when he drafted the terms of the written contracts, he knew that AIG did not want to incur any losses from the transaction. (Trial Transcript, Ex. 37, at 2139-40, 2142.) Because of this, although Mr. Houldsworth's draft contracts appeared

11

to transfer risk to AIG, a separate oral agreement ensured that AIG would not be charged for any losses under the contracts. (Trial Tr., Ex. 37, at 2144:22-25 ("[I]f we had those hundred million of losses, we weren't going to be charging AIG. That wasn't with my understanding of what we wanted to do.").)

- No one from AIG ever asked Gen Re for the documents necessary to conduct an actuarial analysis of the risk associated with the $500 million of contracts Gen Re ostensibly ceded to AIG through the deal, strongly implying that those at AIG familiar with the transaction knew that, despite the written terms of the deal, it entailed no risk for AIG. (Trial Tr., Ex. 37, at 3426-38.)

- Mr. Houldsworth explained that he did not include these additional terms in the written contracts in order to maintain the appearance of risk transfer through the transaction so that AIG could account for the deal as reinsurance, thereby boosting its loss reserves, and to conceal the unusual fact that AIG was paying Gen Re to do the deal. (Trial Tr., Ex. 37, at 2145:8-12 ("[I]f I put them in there it wouldn't look like a reinsurance contract. And obviously the intention from what the start was, they were going to have a piece of paper that would allow them to book that contract as a reinsurance deal which has to have risk transfer.").)

- AIG pursued the no-risk reinsurance deal with Gen Re to inflate artificially AIG's loss reserves to quell industry analysts' concerns that the company's loss reserves were declining during a period of premium growth. (Trial Tr., Ex. 37, at 2139:5-6 ("She [Elizabeth Monrad] said [the transaction] was to appease some analysts who had concerns over AIG's third quarter [2000] numbers."), 2179-80.)

- The defendants and their co-conspirators reinforced the appearance of a legitimate reinsurance transaction by creating a fake offer letter through which Gen Re falsely appeared to solicit the deal from AIG. (Trial Tr., Ex. 37, at 2373:2-8 (Q: "Was that paper trail that you were planning to prepare going to be true or false?" A: "It was going to be false." Q: "And in what way?" A: "Well, it was going to make it appear that we were offering them the contract, whereas in fact they'd actually asked for it."), 2377-84.)

Finally, Mr. Houldsworth's testimony enabled the government to make the most use of the audio tapes of his conversations. He explained what he meant in those conversations, what he perceived others to mean, and placed the conversations in their proper context. While the tapes were extraordinarily powerful evidence of the culpability of the defendants, without Mr. Houldsworth's testimony, the government may have had difficulty introducing them into evidence and the tapes likely would not have as effectively advanced the government's narrative.

### b)    Information Provided by Mr. Houldsworth

On June 9, 2005, after pleading guilty, Mr. Houldsworth spent the afternoon in a proffer session with the government explaining the LPT transaction. That was the first of many proffer sessions. As Mr. Houldsworth testified at the trial, he spent 35 days (over 200 hours) in meetings with representatives of the government over the course of two and a half years, literally from the day he pled guilty until the day he was called to testify. (Trial Tr., Ex. 37, at 2658-59.)

Mr. Houldsworth's assistance was instrumental to the government's investigation of the LPT fraud, which involved not just the five defendants who were convicted at trial, but the companies involved, AIG and Gen Re, and many other individuals and entities. His assistance was significant in part because he was highly knowledgeable about the LPT transaction, but also because he was knowledgeable about reinsurance and, more particularly, finite reinsurance. His trial testimony, which resulted in a verdict against all five defendants on all counts, arguably could not have been more useful to the government.

The nature and extent of Mr. Houldsworth's testimony was exceptional by any measure. His eight days of trial testimony formed the very heart of a case brought against senior executives of two of the largest insurance companies in the world, which had committed a $600 million fraud. While Mr. Houldsworth's eight days of trial testimony alone may be considered extensive, his testimony represented the culmination of years of cooperation with the government as detailed above.

At the trial, Mr. Houldsworth was forthcoming about the fact that his actions in connection with the LPT were wrong. (Trial Tr., Ex. 37, at 2250-51.) In addition, at trial, he readily admitted that during his first interview with the government he had lied about whether he believed that AIG would account for the LPT as risk reinsurance. (Trial Tr., Ex. 37, at 2602.) At trial, he did not even attempt to defend himself by pointing out that he had admitted to all the

13

other aspects of the LPT fraud in that first interview; he did not minimize his conduct. In addition, at trial, Mr. Houldsworth admitted that he engaged in a dishonest, and completely unrelated, transaction in Australia and sent, through other counsel, two misleading letters to an Australian regulator in 2005 with respect to that transaction. (Trial Tr., Ex. 37, at 2599-2601.[7])

### 4. Consequential Injury Suffered, or Danger or Risk of Injury, to Mr. Houldsworth or His Family

Mr. Houldsworth's cooperation and assistance to the government came at a significant price to himself and his family. Cooperation with the government required him to spend substantial periods of time away from his family. In addition, his agreement to plead guilty and cooperate with the government has cost him his job (and his retirement account), has subjected him to multiple civil suits in the United States and to humiliation in the press in the United States and in Ireland, and has permanently branded him with a felony conviction. As the district court observed in United States v. Losovsky, "ordinarily the aid cooperators render comes at a heavy personal price. They may open themselves to prosecution for additional criminal activities they disclose that the Government might not otherwise uncover. Frequently, they place at risk their own liberty, security and safety, and endanger close family and other interests as well." 571 F. Supp. 2d 545, 546-47 (S.D.N.Y. 2008).

The factors enumerated in Losovsky are all present in Mr. Houldsworth's case and to an exceptional degree. The high-profile nature of this case magnified the scrutiny to which he and his family were subjected. There also existed the constant threat of derision and

---

7       Although he never volunteered this information at trial, it was Mr. Houldsworth who brought these letters to the government's attention and produced them for the government, which, in turn, produced them to the defense.

14

ostracism. Because he is a private family man, Mr. Houldsworth's exposure to regular scrutiny in the international press was particularly difficult for him and his family.[8]

In addition, Mr. Houldsworth overcame real world obstacles in order to cooperate with the government; and the circumstances under which he cooperated were extraordinary and worthy of further consideration by this Court. Because he is a foreign national who lives in Ireland, Mr. Houldsworth faced significant challenges just to meet with the government. For each meeting, he had to leave his family and his job in Ireland and travel to the United States, usually for a week or longer. Because these sessions occurred after Mr. Houldsworth had pled guilty to a felony, he had lost his immigration status under the United States' visa-waiver program and was detained by immigration enforcement officials each time he arrived in the United States. On several occasions, he was detained upon arrival for hours by immigration, was told that he would be sent back to Ireland or detained indefinitely. Eventually, he was allowed into the country on the condition that he surrender his passport, which was impounded. (Fortunately, government prosecutors were persistent in their efforts to facilitate his entry, which became somewhat less harried upon each subsequent trip.)

Mr. Houldsworth's substantial assistance, detailed above, presents a situation that is outside the heartland of those situations in which defendants typically cooperate. In light of Mr. Houldsworth's extraordinary assistance to the government and the personal hardships that Mr. Houldsworth and his family experienced in furthering the government's prosecution of this case, his similarly extraordinary acceptance of responsibility and absence of a criminal record, the defense respectfully requests that the Court amply reward Mr. Houldsworth's efforts with the imposition of a non-custodial sentence.

---

[8]      Additional information related to Mr. Houldsworth's exposure to press coverage is contained in Section V(A)(1)(a), infra.

**B.**     **A Departure to a Probationary Sentence and No Fine Is Authorized by the Guidelines**

For the foregoing reasons, a downward departure is warranted that reduces Mr. Houldsworth's total offense level to 8 or lower, for which the Guidelines assign a sentencing range of 0 to 6 months and a fine range of $1,000 to $10,000.[9]  Pursuant to Guidelines sections 5B1.1 and 5B1.2, such a sentence may be satisfied by a term of probation of at least one year. Indeed, a number of courts in the Second Circuit and elsewhere have departed from a Guidelines sentence of five years (and in some cases, much longer sentences) to a probationary sentence under circumstances similar to those here.

For example, in United States v. Smith, No. 06-CR-173 (JBW), 2008 WL 4662346, at *1 (E.D.N.Y. Oct. 28, 2008), the sentencing court departed from the Guidelines imprisonment range of 235 and 240 months to five years probation, 500 hours community service and a $100,000 fine for a defendant who conspired to commit mail fraud in light of the defendant's substantial assistance and his absence of a criminal record.

In United States v. McKillop, No. 06-CR-336 (JBW), 2008 WL 4862381, at *1 (E.D.N.Y. Sept. 8, 2008), the sentencing court departed from the Guidelines imprisonment range of 210 to 240 months to five years probation, 250 hours community service and a $10,000 fine for a defendant who conspired to commit mail fraud based primarily on defendant's substantial assistance, absence of a criminal record, and because defendant "did not receive any personal gain from the instant offense other than her ability to keep her job."

---

[9]     The issue of Mr. Houldsworth's fine is discussed in Section VI, infra. The defense points out here only that, pursuant to Guidelines section 5E1.2, when the defendant shows that he is unable to pay and is not likely to become able to pay a fine, a fine need not be imposed by a court imposing a sentence under the Guidelines.  U.S.S.G. § 5E1.2(a).  In Section VI, infra, the defense details the financial difficulties confronting the Houldsworth family and the hardship that a monetary fine would impose on them.

In <u>United States v. Faiella</u>, No. 06-CR-335 (JBW), 2008 WL 4862455, at *1 (E.D.N.Y. Sept. 8, 2008), the sentencing court departed from the Guidelines imprisonment range of 151 to 188 months imprisonment for a defendant who conspired to commit mail fraud to five years probation and 500 hours community service based on substantial assistance and the absence of a criminal record.

In <u>United States v. Springer</u>, No. 06-CR-334 (JBW), 2008 WL 4867883, at *1 (E.D.N.Y. Sept. 8, 2008), the sentencing court departed from the Guidelines imprisonment range of 210 to 240 months for a defendant who conspired to commit mail fraud to five years probation and 500 hours community service based on substantial assistance and the absence of a criminal record.

In <u>United States v. Munir</u>, No. 98 CR 60 (RWS), 1999 WL 1140865, at *1 (S.D.N.Y. Dec. 13, 1999), the sentencing court departed downward for a defendant who pled guilty to conspiracy to commit bank fraud and bank fraud to one year of probation based on the defendant's substantial assistance, acceptance of responsibility, and the absence of a criminal record.

Furthermore, in other high-profile securities fraud cases involving substantially larger loss amounts with even more severe consequences to shareholders, such as the WorldCom and HealthSouth cases, courts have departed from the Guidelines to impose non-custodial sentences with no fine or a substantially reduced fine on key cooperating witnesses. <u>See, e.g.,</u> <u>United States v. Normand</u>, 02 Cr. 1341 (BSJ), at 12 (S.D.N.Y. Aug. 5, 2005) (sentencing WorldCom cooperator to three years probation, no fine, and special assessment of $200); <u>United States v. Livesay</u>, 03-CR-182 (KOB), at 38 (N.D. Ala. July 16, 2007) (resentencing HealthSouth

cooperator to five years' probation, six months' home detention, a $10,000 fine, and special assessment of $200).

**V.    IF THE COURT IMPOSES A NON-GUIDELINES SENTENCE, A NON-CUSTODIAL SENTENCE IS APPROPRIATE**

The Supreme Court's decisions in Booker, Gall, and Kimbrough, have given this Court broad discretion, after considering all of the factors under section 3553(a), including the advisory Guidelines, to impose a sentence outside the Guidelines. See Kimbrough v. United States, 128 S. Ct. 558, 570 (2007). This Court's sole statutory mandate is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing" under § 3553(a)(2). Id. (quoting 18 U.S.C. § 3553(a)). The goals of sentencing are to provide just punishment, adequate deterrence, incapacitation, and rehabilitation. See Rita v. United States, 127 S. Ct. 2456, 2463 (2007). In doing so, courts "may not presume that the Guidelines range is reasonable." Gall v. United States, 128 S. Ct. 586, 596-97 (2007). To the contrary, "courts may vary from the Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines." Kimbrough, 128 S. Ct. at 570 (citation and alteration marks omitted); accord United States v. Jones, 531 F.3d 163, 172 (2d Cir. 2008).

The "central teaching of Gall is that the Guidelines are truly advisory." United v. Gardellini, 545 F.3d 1089, 2008 WL 4889971, at *5 (D.C. Cir. Nov. 14, 2008). This Court does not need to cite "extraordinary" reasons to justify a non-Guidelines sentence, nor must it offer a justification "proportional" to the extent of any variance. See Gall, 128 S. Ct. at 594-95, 596; Jones, 531 F.3d at 171-72; see also United States v. Adelson, 2008 WL 5155341, at *5 (2d Cir. Dec. 9, 2008) ("'[D]istrict court decisions, if adequately explained, should be re-viewed especially deferentially [in financial fraud cases].'") (citations omitted). Rather, this Court is at liberty, after considering the Guidelines, to disagree with the Guidelines, and to impose its own

18

sentence that is sufficient, but not greater than necessary, to serve the purposes of sentencing.

Kimbrough, 128 S. Ct. at 570.

When sentencing a defendant, a district court must consider all sentencing factors

enumerated in 18 U.S.C. § 3553(a). Kimbrough, 128 S. Ct. at 570. Those factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed:
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the advisory guideline range;
> (5) any pertinent policy statements issued by the Sentencing Commission;
> (6) the need to avoid unwarranted sentence disparities; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). We respectfully submit that the following sentencing factors, when applied

to Mr. Houldsworth and the instant offense, warrant a non-custodial sentence, especially when

these factors are considered in combination.

### A.    Mr. Houldsworth's Personal History and Characteristics, and the Characteristics of the Offense, Warrant a Non-Custodial Sentence

Mr. Houldsworth's personal history and characteristics justify a non-custodial

sentence: he is a first time offender, a devoted husband and family man, and a valued member of

his community. Mr. Houldsworth's status as a deportable alien entails additional hardships for

him. Furthermore, there is no chance that he will engage in this type of criminal conduct in the

future. He has demonstrated exemplary acceptance of responsibility for his participation in the

LPT fraud, and has provided crucial assistance to the government in its prosecution of the other

participants in the fraud. The characteristics of the offense also support a non-custodial sentence

19

because Mr. Houldsworth was not motivated by personal financial gain in participating in the LPT fraud and did not profit from it.

### 1.    Mr. Houldsworth's Personal History and Characteristics

#### a)    Mr. Houldsworth's Personal History

As illustrated by the 36 letters submitted to this Court by Mr. Houldsworth's family, friends, and colleagues, Mr. Houldsworth has lived a life dedicated to family, career, and community. For more than 20 years, Mr. Houldsworth has been a devoted husband to his wife, Ruth. (Letter of Ruth Houldsworth, Ex. 14.) Mr. Houldsworth has been a loving and constant father to his three children, Nicholas, Alice, and Victoria. Since the birth of his children, Mr. Houldsworth has been the sole financial provider for the family, and is close to his children and involved in their lives to an extraordinary degree. (Letter of Ruth Houldsworth, Ex. 14.) Mr. Houldsworth has been a much admired and highly respected leader in his profession, having been elected by his peers in 1999 to a two year term as the Chair of the Dublin Insurance Managers Association. Mr. Houldsworth is a pillar in his community, volunteering his time in works both great and small. (Letter of Graham Gibson, Ex. 11.) Throughout his life, from his years as a student in Quaker school to his time as a leader in the reinsurance industry to his acceptance of responsibility and decision to cooperate with the government in the present criminal matter, Mr. Houldsworth has strived to do the right thing. (Letter of David Houldsworth, Ex. 13.)

Growing up, while their father was serving in the British foreign service, Mr. Houldsworth and his siblings, David and Susan, attended boarding school in the UK. (Letter of David Houldsworth, Ex. 13.) As David notes, in their father's absence, Mr. Houldsworth was David's best friend and mentor, "stepp[ing] in to help [him] get over the tough times." (Letter of David Houldsworth, Ex. 13.) Susan states that Mr. Houldsworth has been a great influence on

her and "a continual source of inspiration" in many areas of her life. (Letter of Susan Houldsworth, Ex. 15.)

Mr. Houldsworth has also been a mentor to friends and colleagues alike. As just one example, Gregory Kim, a former colleague of Mr. Houldsworth at Gen Re, states that Mr. Houldsworth "has been and still is the most influential person ... both professionally and personally" Mr. Kim has known. (Letter of Gregory Kim, Ex. 19.)

Mr. Houldsworth has been a very caring and supportive co-worker and boss. It is clear from the letters that Mr. Houldsworth was treasured by his colleagues and employees. The community feeling and collegial nature of the Dublin office Mr. Houldsworth built was truly extraordinary. Ralf Quick, a former employee, states that Mr. Houldsworth strove to create a "positive, friendly and open office culture." (Letter of Ralf Quick, Ex. 29.) Mr. Houldsworth's former employee Arno Junke states that Mr. Houldsworth was a "hard working, team-oriented manager" with a "sincere interest in people." (Letter of Arno Junke, Ex. 16.) For Mr. Houldsworth, one of the most difficult and heart-breaking consequences of his mistakes is the fact that the office he built and the unique family feeling cultivated in that office no longer exist because Gen Re closed the CRD office as a result of the present criminal matter. (Letter of Ruth Houldsworth, Ex. 14.)

It also is clear from the letters that Mr. Houldsworth is greatly appreciated by his current employer. Catherine Ghose, his current boss, points out that Charles McCann Investments, for whom Mr. Houldsworth is now a financial controller, is getting a bargain on him, stating that the company does "not pay him what we would have to pay for a man of his caliber if this court case had not occurred." (Letter of Catherine Ghose, Ex. 10.)

An avid sportsman – a one-time player of field hockey, he now volunteers as a coach to youth teams in his community and is a passionate golfer – Mr. Houldworth has a tremendous sense of fairness both on the hockey pitch and on the golf course. (Letter of Graham Gibson, Ex. 11; Letter of Gordon Watkins, Ex. 36)  One dear friend of Mr. Houldsworth, from the Houldsworth family's two years living in Connecticut, recounts a story in which Mr. Houldsworth missed out on his best opportunity to shoot par by accidentally tapping the ball when addressing a putt – a mis-hit which no one but Mr. Houldsworth had seen. (Letter of Michael J. Cascio, Ex. 7.)

Mr. Houldsworth's sense of integrity is not limited to his reputation on the playing field.  Christopher McCann, a friend and former employee who recommended Mr. Houldsworth for his current job, stated that he had no hesitation in recommending Mr. Houldsworth for a "trusted position of money management" within Mr. McCann's own family business. (Letter of Christopher McCann, Ex. 22; Letter of Carl McCann, Ex. 21.)  Neil Stone-Wigg, a friend of Mr. Houldsworth's and the founder of a 2.9 million Euro a year information and communication technology company in Dublin employing 25, has provided in his will that John become the manager of the company in the event that Mr. Stone-Wigg and his wife were to die at the same time. (Letter of Neil Stone-Wigg, Ex. 33.)

Mr. Houldsworth also has earned the esteem of the many people in his circle with his ability to maintain a positive outlook, to provide emotional and financial support to his family, and to give back to his community in significant ways during these past four years while he has been a defendant in this action. (Letter of Ruth Houldsworth, Ex. 14; Letter of Charles and Margaret Schaeffer, Ex. 31; Letter of Andrew Morris, Ex. 25; Letter of Eileen Murphy, Ex. 26; Letter of Philip and Christine Barnes, Ex. 3.)  During these last several years, Mr.

Houldsworth has impressed his friends with his ability to be a source of comfort and a confidant to them in their times of need. As described by Christopher Sykes, a friend and former colleague, Mr. Houldsworth stood by Mr. Sykes following the tragic death of Mr. Sykes's wife to cancer in 2005. (Letter of Christopher Sykes, Ex. 34.) In the years leading up to Mrs. Sykes's passing, the Houldsworths provided meals, transportation, childcare, and emotional support to the Sykes family. As Mr. Sykes describes it, "At my time of greatest need, John Houldsworth was there for me. [...] He was my confidant, my compass, the voice of reason that kept me on track that allowed me to get through what I needed to do to be there for Sarah and my children." (Letter of Christopher Sykes, Ex. 34.) In 2005, Mr. Houldsworth was also there for his friend Andrew Baddeley at the time of the unexpected death of Mr. Baddeley's mother. As noted by both Mr. Sykes and Mr. Baddeley, Mr. Houldsworth stood by his friends and was a source of comfort and support for them despite the tremendous difficulties he himself was facing in the present criminal matter. (Letter of Andrew Baddeley, Ex. 2; Letter of Christopher Sykes, Ex. 34.)

Mr. Houldsworth is a rock for his family, financially, emotionally, and morally. As exhibited in letter after letter submitted to this Court, Mr. Houldsworth's life has been dedicated to the well-being of his family, and his family in turn relies on Mr. Houldsworth to an exceptional degree. One consequence of this reliance is that Mr. Houldsworth's family faces a daunting and highly uncertain future, both with respect to its financial stability and its emotional strength, as a result of the present criminal matter. (Letter of Ruth Houldsworth, Ex. 14.) At present, the Houldsworth family, although they have suffered serious setbacks, are beginning to look to a better, more stable future. Though less well off than they once were – as a result of Mr. Houldsworth's curtailed earning potential and the seizure by Gen Re of his retirement savings –

23

the Houldsworth family is beginning to put the last several years behind them and is starting to rebuild their lives.

In addition to the financial strains, Mr. Houldsworth and his family have suffered severe and possibly irreparable reputational harm as a result of the substantial press coverage of this high-profile criminal matter and the prominent role played by Mr. Houldsworth at trial. Catherine Ghose, Mr. Houldsworth's current boss, describes the regular reporting on Mr. Houldsworth in the "Irish newspaper of record," the Irish Times,[10] noting that she was aware of the present criminal matter from the newspaper reports before she met Mr. Houldsworth. (Letter of Catherine Ghose, Ex. 10.) Enda Allen states that Mr. Houldsworth "was pilloried in the Irish media and suffered greatly from his lost reputation." (Letter of Enda Allen, Ex. 18.) John Moran relates that the Irish press's "demoniz[ation]" of Mr. Houldsworth had a "very unfortunate side effect" on the Houldsworth family. (Letter of John A. Moran, Ex. 24.) Such intense media scrutiny would be difficult for any family that values privacy as the Houldsworths do. In a country as small as Ireland, however, with a population of less than 5 million, unrelenting media coverage of Mr. Houldsworth and his mistakes have been almost unbearable for him, for his wife, and for his children.

We submit that a custodial sentence for Mr. Houldsworth, or the imposition of a significant fine, would halt the family's rebuilding process in its tracks, just when Mr. Houldsworth and his family are beginning to see a better future ahead.

---

[10]    While Mr. Houldsworth and the present criminal matter have received media coverage in the United States, the scrutiny to which Mr. Houldsworth, the only Ireland-based co-defendant in this action, has been subjected in the Irish press has been extraordinary in both quantity and harshness. The defense points the Court to just a small sample of the coverage in Ireland's main newspaper, the Irish Times: Justin O'Brien, "After hubris always comes catastrophe," Irish Times, Feb. 09, 2009; Arthur Beesley, "Guilty Plea move results in Cologne Re Sacking," Irish Times, June 8, 2005; Arthur Beesley, "Cologne Re chief 'created false documents' – US lawsuit," Irish Times, May 27, 2005.

b)    **Mr. Houldsworth's Status as a Deportable Alien**

In the event that the Court decides to impose a non-Guidelines sentence, the Court should consider Mr. Houldsworth's status as a deportable alien, which likely would result in any prison term he received being harsher and longer than that of an ordinary inmate.[11] Although Mr. Houldsworth does not live, work, or otherwise have any regular contact with the United States, he has voluntarily traveled to the United States to plead guilty in this criminal action, cooperate with the government, and be sentenced by this Court. Under United States immigration laws, however, once he arrives in the United States to serve any term of imprisonment, Mr. Houldsworth is classified as a "deportable alien." The term deportable alien merely means that a person is an alien (i.e., not a citizen) and that he is subject to deportation. See Bureau of Prisons, Program Statement 5100.07 (Sept. 3, 1999) ("BOP PS 5100.07") at 3[12] ("A 'Deportable Alien' is a male or female inmate who is a citizen of a foreign country, rather than the United States."); 18 U.S.C. § 1227(a)(2)(A)(i) (providing that an alien "convicted of a crime involving moral turpitude committed within five years" and "convicted of a crime for which a sentence of one year or longer may be imposed, is deportable"); 18 U.S.C. § 371 (providing for a maximum term of five years imprisonment for a conviction).

---

[11]    Mr. Houldsworth's status as a deportable alien presents hardships for Mr. Houldsworth and his family in addition to those discussed here. Mr. Houldsworth's inability to reenter the United States imposes a significant constraint on his current and future employment prospects given the international orientation of his profession. In addition, Mr. Houldsworth's inability to reenter the United States also places a strain on the strong ties Mr. Houldsworth has with the many United States citizens he counts as close personal friends. Lastly, in light of Mr. Houldsworth's status as a non-United States citizen, a sentence of incarceration would be unduly burdensome on Mr. Houldsworth. The administrative process for transferring Mr. Houldsworth to serve his prison sentence in Ireland could very well take between 18 to 24 months. Therefore, any custodial sentence of Mr. Houldsworth of 12 to 18 months or less would render Mr. Houldsworth's transfer to Ireland moot, resulting in him serving his sentence in the United States, far from his wife and children in Ireland.

[12]    Chapter 7 of the Bureau of Prisons Program Statement 5100.07, dated September 3, 1999, is attached hereto at Exhibit 39. Page numbers referenced herein refer to page numbers within Chapter 7 of the Program Statement.

Mr. Houldsworth's status as a deportable alien has severe negative consequences under standard Federal Bureau of Prisons ("BOP") regulations.  Deportable aliens, unlike other inmates in the general population, are not eligible for community confinement programs or "CCCs."  Compare 18 U.S.C. § 3624(b) (providing that inmates may serve up to the last six months of their sentence in community confinement programs) with BOP PS 5100.07, Ex. 39, at 3 (providing that deportable alien status "also prevents placement in a CCC").

In addition, deportable aliens cannot be designated as "minimum security" inmates or assigned to minimum security facilities.  See 18 U.S.C. § 3621(b) (empowering the BOP to "designate the place of the prisoner's imprisonment"); BOP PS 5100.07, Ex. 39, at 3 (providing that deportable aliens "shall be housed in at least a Low security level institution"); see also United States v. Cubillos, 91 F.3d at 1344 (9th Cir. 1996) ("The Bureau has determined that a prisoner's 'deportable alien' status is a Public Safety Factor requiring increased safety measures.").  The increased security designation would mean that Mr. Houldsworth would serve his time with inmates that have committed violent crimes, including sex offenders.  See BOP PS 5100.07, Ex. 39, at 7.

Finally, there is a real possibility that pending deportation, Mr. Houldsworth could serve a substantial amount of time in prison after his sentence is complete.  Although the duration of removal proceedings varies among the United States' 214 immigration judges, significant backlogs exist across the country.  A recent investigation indicated that immigration courts are so backed up that over the last five years nearly 90,000 people in deportation proceedings waited more than two years before they appeared before a judge.[13]  In certain areas, such delays extend for up to five years.  Thus, Mr. Houldsworth's status as a deportable alien

---

[13]    Brad Heath, "Immigration Courts Face Huge Backlog," USA Today, March 29, 2009.

could result in any custodial sentence he may receive from this Court being years longer than the sentence imposed by this Court.

Although the Second Circuit Court of Appeals has held that consequences derived from a defendant's status as a deportable alien such as post-imprisonment detention pending deportation and limitations on how deportable aliens may be designated are not permissible grounds for issuing a downward departure, see United States v. Restrepo, 999 F.2d 640, 644-47 (2d Cir. 1993), this Court may consider these factors in the context of a non-Guidelines sentence. A number of federal appellate courts have recognized that a defendant's status as a deportable alien, given the harsher treatment such defendants face under BOP regulations, provides a sound basis for a court to order a sentence less than that mandated by the Guidelines. See United States v. Davoudi, 172 F.3d 1130, 1133-34 (9th Cir. 1999) (finding that where defendant was convicted of making false statements to a bank, the district court had discretion to order a downward departure from the Guidelines because deportable alien may be unable to take advantage of minimum security designation of the up to six months of home confinement authorized by 18 U.S.C. § 3642(c)); Cubillos, 91 F.3d at 1344 (9th Cir. 1996) (acknowledging that a court may consider a defendant's status as a deportable alien when deciding whether to order a downward departure from the Guidelines); United States v. Farouil, 124 F.3d 838, 847 (7th Cir. 1997) ("[D]istrict court[s are] ... free to consider whether [defendant's] status as a deportable alien has resulted in unusual or exceptional hardship in his conditions of confinement."); United States v. Tanellus, 201 F.3d 439 (Table), 1999 WL 1008982, at *2 (4th Cir. Nov. 8, 1999) (same).

In addition, several district courts have imposed a lesser sentence than what was mandated under the Guidelines based on alien status in cases where that status caused increased severity in punishment. For example, in United States v. Bakeas, the court ordered a

27

probationary sentence and home confinement to a permanent resident alien who had lived in the United States for 20 years. 987 F. Supp. 44, 51-52 (D. Mass. 1997). The court reasoned that the case was outside the heartland because while Bakeas's alien status meant that defendant would have to serve his time in a medium security facility in another state, whereas judges routinely sentence citizens convicted of the same offense (bank embezzlement) to minimum security prison camps or local community treatment centers for their entire confinement period. Id. at 46-52.

Similarly, in United States v. Roberts, the court found that "[a] deportable alien convicted of a crime is generally subjected to a harsher term of confinement solely because of his status as a deportable alien. Such a sentenced prisoner is not eligible for minimum security confinement or early release to a halfway house." No. Crim. 01-25101, 2002 WL 32341803, at *3 (E.D. Pa. Mar. 4, 2002). The Roberts court ordered a downward departure from the Guidelines on the basis of Roberts's status as a deportable alien because "his incarceration would be harsher than other inmates similarly situated who are not deportable aliens." Id.

In this case, Mr. Houldsworth's status as a deportable alien counsels for a probationary sentence. Mr. Houldsworth should not be punished for voluntarily traveling to a foreign country to accept responsibility for his actions. Rather, in order to encourage future potential cooperating witnesses, this Court should amply reward him for placing his trust in the United States criminal justice system and coming here voluntarily to subject himself to an uncertain fate. Accordingly, because his immigration status as a deportable alien subjects him to harsher conditions of confinement and potentially a longer term of confinement, this Court should sentence Mr. Houldsworth to a non-Guidelines sentence of probation.

### 2.    Mr. Houldsworth's Acceptance of Responsibility

Throughout the course of the government's investigation and prosecution of

individuals involved in the LPT fraud, Mr. Houldsworth demonstrated an extraordinary degree of

acceptance of responsibility. In addition to Mr. Houldsworth's extensive assistance to the

government, detailed in Section IV supra, Mr. Houldsworth's admission that the LPT was

deceptive and wrong, as exhibited by the plea agreement he entered into with the government

under which he agreed to plead guilty and cooperate with the government's investigation of the

LPT fraud by providing "full, complete and truthful cooperation" (Plea and Cooperation

Agreement, Ex. 40, at 7.), and his guilty plea itself, support a non-custodial sentence.

As part of the plea agreement, Mr. Houldsworth agreed to a statement of facts

which detailed the full scope of his involvement in the LPT fraud. (Statement of Facts, Ex. 41.)

In addition, Mr. Houldsworth was the first of his co-conspirators to accept responsibility for his

actions by executing a plea agreement with the government, and the first of his co-conspirators to

enter a guilty plea.

### 3.    Mr. Houldsworth's Substantial Assistance to the Government

In the event the Court decides to impose a non-Guidelines or "variance" sentence

under 18 U.S.C. § 3553, the Court can and should consider the substantial assistance that Mr.

Houldsworth provided to the government in its investigation and prosecution of the individuals

involved in the LPT fraud, as outlined in Section IV above.[14]

---

[14]    Some courts consider substantial assistance as part of a non-Guidelines or variance sentence. See, e.g.,
United States v. Alatsas, No. 06-CR-473 (JBW), 2008 WL 238559, at *2 (E.D.N.Y. Jan. 16, 2008)
(considering substantial assistance as part of non-Guidelines sentence); United States v. Smith, No. 06-CR-
173 (JBW), 2008 WL 4662346, at *1 (E.D.N.Y. Oct. 28, 2008) (departing from Guidelines and imposing
variance sentence due to defendant's substantial assistance); United States v. McKillop, No. 06-CR-336
(JBW), 2008 WL 4862381, at *1 (E.D.N.Y. Sept. 8, 2008) (same). Other courts first depart from the
Guidelines based on substantial assistance, and then grant a variance from the departure sentence based on
other non-Guidelines factors. See, e.g., United States v. Wright, No. 3:CR-04-100, 2008 WL 4722508, at
*1 (M.D.Pa. Oct. 23, 2008); United States v. Miller, No. 2:07-cr-90-FTM-29SPC, 2008 WL 697359, at *2

29

### 4.    The Nature and Characteristics of the LPT Fraud[15]

The nature and characteristics of the LPT Fraud have been discussed in detail in

Section IV above.  It should be added, however, that, as this Court has stated in connection with

sentencing Mr. Houldsworth's co-conspirators, the LPT fraud is substantially different from

many securities fraud cases, including Enron, WorldCom, and Adelphia.  In this case, Mr.

Houldsworth and his co-defendants did not receive any direct personal financial gain from the

LPT transaction, and were not motivated by such gain in entering into the LPT transaction, a

factor that courts have, in the context of a Guidelines sentence, held to warrant a downward

departure pursuant to U.S.S.G. § 2B1.1 (cmt. 19(c)).  United States v. Forchette, 220 F. Supp. 2d

914, 925 (E.D. Wis. 2002).  Mr. Houldsworth received no financial benefit from the LPT, and he

expected to gain nothing from it.  He repeatedly indicated that he did not care whether the

company for which he worked, CRD, gained anything from it.  (Trial Tr., Ex. 37, 2494-97

(arguing that CRD should get less of the fee).)  Mr. Houldsworth erred when he agreed to help

Ms. Monrad and others in crafting the LPT, but certainly he did not do so out of greed.[16]

Second, the offense, while certainly serious, did not bring about the collapse of

AIG, a large public company.  The offense occurred, and was revealed to the public, well before

the recent serious economic downturn that has affected a number of large public financial

---

(M.D. Fla. Mar. 13, 2008).  In any event, this Court may consider both substantial assistance and other "non-Guidelines" or "variance" factors when fashioning its sentence for Mr. Houldsworth.

[15]    With respect to background regarding the offense, we respectfully refer the Court to the Agreed Statement of Facts, Ex. 41, the recitation of the offense conduct contained in the PSR, Ex. 38, and Mr. Houldsworth's testimony at the trial of his co-conspirators.

[16]    As the Court is aware, this factor was critical to the Court's decision to sentence Mr. Houldsworth's co-conspirators to sentences substantially less than their respective Guidelines sentences.  While Mr. Ferguson, Mr. Milton, Mr. Garand, Ms. Monrad, and Mr. Graham faced sentences of up to life in prison, the Court, citing the co-conspirators' lack of personal gain in the LPT fraud, imposed custodial sentences upon these co-conspirators of 2 years, 4 years, 1 year and a day, 1 year and a half, and 1 year and a day, respectively.

institutions, including AIG. As this Court has noted in connection with the sentencing of Mr.

Houldsworth's co-conspirators, the LPT was not a fraud that caused the collapse of AIG.

**B.    A Non-Custodial Sentence Would Promote Respect for the Law, Provide Just Punishment, and Satisfy the Needs of General and Specific Deterrence**

**1.    Promoting Respect for the Law, Rewarding Cooperation, and Providing Just Punishment**

In volunteering to come to the United States to plead guilty, cooperate with the

government, and be sentenced, Mr. Houldsworth has demonstrated ample respect for the law.

Given his extraordinary acceptance of responsibility for his own actions, and the trust he has

placed in the United States criminal justice system, a non-custodial sentence would promote

respect for the law by rewarding cooperating defendants like Mr. Houldsworth for doing the

right thing.

The touchstone for just punishment is a sentence that is sufficient, but not greater

than necessary, to serve the purposes of sentencing. Kimbrough, 128 S. Ct. at 570; 18 U.S.C. §

3553(a). In this case, we respectfully submit that a non-custodial sentence would be the only just

punishment for Mr. Houldsworth. Any notion that Mr. Houldsworth would be somehow "getting

off the hook" by not going to jail is wrong. Mr. Houldsworth has been branded a felon, which is

a stain that can never be removed. He has had to confess to his three children that he committed

a fraud and is now and forever a felon. See United States v. Myers, 353 F. Supp. 2d 1026, 1031

(S.D. Iowa 2005) (sentencing defendant to time served rather than Guidelines range of 20 to 30

months for unlawful possession of an illegal firearm, stating that once a defendant is convicted,

the defendant has been branded a felon and being known as such by family, friends, and society

is "no small punishment" for one known for high moral standards and character). As a result of

Mr. Houldsworth's voluntary guilty plea, he was fired from his job, lost most of his retirement

savings (which were seized by Gen Re) and was subject to the humiliation of negative press in

the United States and Ireland. During the almost four years since he pled guilty, he has had to endure the constant dread of a possible term of incarceration in the United States that would forcefully remove him from his family. In addition, as a direct result of his guilty plea, Mr. Houldsworth has been named as a defendant in four pending civil suits: In re American Int'l Group Sec. Litig., No. 04-cv-8141-JES (S.D.N.Y.) (filed Oct. 15, 2005); In re American Int'l Group, Inc. Derivative Litig., No. 04-cv-8406 (JES) (S.D.N.Y.) (filed Oct. 25, 2004); American Int'l Group, Inc. Consol. Derivative Litig., C.A. No. 769 (VCS) (Del. Ch.) (filed Oct. 21, 2004); Teachers' Ret. Sys. of La and City of New Orleans Employees' Ret. Sys. v. Cantwell, et al., No. 650064/2009 (BF) (N.Y. Sup. Ct.) (filed Feb. 11, 2009); and is a defendant in a case brought by the Securities and Exchange Commission (S.E.C. v. Houldsworth, No. 05-cv-5325 (LAP) (S.D.N.Y.) (filed June 6, 2005)); and is subject to other administrative actions. In addition, once this case is concluded, regardless of his sentence, it is highly likely that Mr. Houldsworth will never again be allowed entry into the United States.

Furthermore, viewed in comparison to the sentences imposed on his co-defendants who received non-Guidelines sentences that varied substantially from the prescribed imprisonment ranges, imposing a sentence of imprisonment would fail to reward Mr. Houldsworth for the cooperation and assistance he has provided to the government. Courts in this Circuit have consistently recognized the importance of rewarding defendants who cooperate with the government. See, e.g., United States v. Boscarino, 437 F.3d 634, 638 (2d Cir. 2006); United States v. John Doe, 79 F.3d 1309, 1316 (2d Cir. 1996). In this instance, a non-custodial sentence would serve to reward Mr. Houldsworth for his substantial cooperation with the government.

Finally, a sentence of incarceration would be unjust punishment because it would fail to account for the substantial distinction between Mr. Houldsworth, who accepted responsibility for his actions and provided substantial assistance to the government, and his fellow conspirators, who did just the opposite and forced the government to expend its valuable resources to make its case to a jury in a lengthy trial.

### 2.    General Deterrence

A sentencing court also must consider the need for the sentence imposed to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).  Courts have recognized that criminal convictions in high-profile white-collar cases, irrespective of the sentences imposed, have a substantial deterrent effect on other similarly situated individuals. The publicity associated with such convictions serves to deter similar crimes such that a substantial sentence of incarceration is not necessary to serve this goal of federal sentencing.  Additionally, courts have recognized "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." Adelson, 441 F. Supp. 2d at 514 (citing Richard Frase, Punishment Purposes, 58 Stan. L. Rev. 67, 80 (2005); Elizabeth Szockyj, Imprisoning White-Collar Criminals?, 23 S. Ill. U. L.J. 485, 492 (1998)).

In this case, the Court has already sentenced five of Mr. Houldsworth's co-conspirators to substantial terms of incarceration, which will undoubtedly have a deterrent effect. See Gall, 128 S. Ct. at 599 ("The Government's legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law is at least to some extent offset by the fact that seven of the eight defendants in this case have been sentenced to significant prison terms.").

33

### 3.    Specific Deterrence

In determining an appropriate sentence, courts must also consider the need for the sentence to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). In Mr. Houldsworth's case, there is no chance of recidivism.

Courts have stated that a key indicator of the likelihood of recidivism is the defendant's age at the time of sentencing. Mr. Houldsworth will be 50 years old when he is sentenced. A non-Guidelines sentence is appropriate in the case of an older first-time offender because the Sentencing Guidelines do not take into account the fact that defendants who are over the age of forty "exhibit markedly lower rates of recidivism in comparison to younger defendants." United States v. Carmona-Rodriguez, No. 04 CR.667 (RWS), 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (citations omitted) (imposing a non-Guidelines sentence of 30 months rather than a sentence within the Guideline range of 46 to 57 months, in part because defendant was a 55-year-old first offender).[17] As the court stated in Simon, "[t]he Guidelines' failure to account for [the correlation between increased age and decreased recidivism rates] renders it an imperfect measure of how well a sentence protects the public from further crimes of the defendant." 361 F. Supp. 2d at 48.

Another key factor affecting the likelihood of recidivism is criminal history. Mr. Houldsworth is a first-time offender, who immediately and completely accepted responsibility for his conduct in this case, who has spent the past several years cooperating with the government, and who has clearly demonstrated remorse for his actions in connection with the LPT fraud. The letters submitted on Mr. Houldsworth's behalf make abundantly clear that Mr.

---

[17]    See also United States v. Hernandez, No. 03 CR. 1257 (RWS), 2005 WL 1242344, at *5 (S.D.N.Y. May 24, 2005) (imposing non-Guidelines sentence on 49-year-old defendant in part because defendants over 40 "exhibit markedly lower rates of recidivism in comparison to younger defendants"); United States v. Kee, No. 04 CR. 271 (RWS), 2005 WL 1162449, at *4 (S.D.N.Y. May 13, 2005) (imposing non-Guidelines sentence in part due to fact that defendant was first time offender); Simon, 361 F. Supp. 2d at 49 (sentencing 43-year-old defendant to lower non-Guidelines sentence).

Houldsworth is not a criminal from whom the public needs protection, and there is no chance of recidivism in this case. Accordingly, this factor weighs in favor of a non-Guidelines, non-custodial sentence.

Indeed, the PSR specifically counsels that a term of incarceration is not necessary. The PSR states that "Mr. Houldsworth is a first-time offender, with stable personal and employment histories. There is nothing in his past to indicate that he [has] ever been anything other than a law abiding citizen. It appears highly unlikely based on the information available at this time that he will be involved in future criminal conduct. Given this information, any of the available sentencing options [including probation] will adequately address all the factors to be taken into consideration in the determination of an appropriate sentence." (PSR, Ex. 38, ¶ 81.) We respectfully concur, and urge the Court for these reasons alone to impose a non-custodial sentence.

## C.    Probation Is an Available Sentence for Mr. Houldsworth

18 U.S.C. § 3553(a)(3) directs the judge to consider sentences other than imprisonment. In this case, Mr. Houldsworth is eligible for probation.[18]  (PSR, Ex. 38, ¶ 74.)

---

[18]    It should be noted that despite Mr. Houldsworth's status as a citizen of a foreign country, probation is an available sentence to the Court. Under 18 U.S.C. § 4100, offenders may be transferred to and from a foreign country to serve their sentences so long as a treaty providing for such transfer is in force. See 18 U.S.C. § 4100(a)-(b) (2009). The treaty providing for such a transfer as between the United States and Ireland is the Council of Europe Convention on the Transfer of Sentenced Persons ("the Convention"), which entered into force as between these countries on June 7, 1985. Under 18 U.S.C. § 4102, the Attorney General of the United States is authorized to "transfer offenders under a sentence of imprisonment, on parole, or on probation to the foreign countries of which they are citizens or nationals." 18 U.S.C. § 4102(3) (2009) (emphasis added). While Mr. Houldsworth is a citizen of the United Kingdom and not of Ireland, under article 3(4) of the Convention, a state may adopt its own definition of "national" for purposes of the Convention. Council of Europe Convention on the Transfer of Sentenced Persons art. 3(4). In its declaration of July 31, 1995, with respect to the Convention, Ireland defined "national" as an "Irish citizen or any person whose transfer to Ireland Ireland considers appropriate having regard to any close ties which the person has with Ireland." Declaration Contained in Instrument of Ratification Deposited on July 31, 1995. Mr. Houldsworth's extensive ties with Ireland – including the many years he has lived in Ireland; the fact that his family lives in Ireland; the fact that he owns property in Ireland; and Mr. Houldsworth's extensive work history in Ireland – constitute "close ties" with Ireland so as to warrant Mr. Houldsworth's status as an Irish national for purposes of the Convention. Thus, Mr. Houldsworth may serve a sentence of probation issued by this Court in Ireland.

The offense to which he pled guilty, 18 U.S.C. § 371, carries a maximum term of five years'
imprisonment, a Class D felony. See 18 U.S.C. § 3559(a)(4). Because the offense is a Class D
felony, Mr. Houldsworth is eligible for probation. See 18 U.S.C. § 3561(a). The appropriate
term for a probationary sentence is one to five years. See 18 U.S.C. § 3561(c)(1). In
determining whether to impose a term of probation, and if a term of probation is to be imposed,
the length of the term and the conditions of probation, the court shall consider the factors set
forth in 18 U.S.C. § 3553(a). See 18 U.S.C. § 3562. In light of the § 3553(a) factors discussed
above, defendant respectfully requests that the Court impose a sentence of one year of probation.

### D. Sentencing Mr. Houldsworth to a Term of Probation Would Avoid Unwarranted Sentencing Disparities

Courts must consider "the need to avoid unwarranted sentence disparities among
defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §
3553(a)(6). Within the Second Circuit, a non-custodial sentence would not create a disparity
between Mr. Houldsworth and other defendants who conspired to commit fraud, who are also
first-time offenders, did not profit from their conduct, and provided substantial assistance to the
government.

Mr. Houldsworth's sentence should also be compared to the sentences imposed by
the Court on his co-conspirators. The Court sentenced Mr. Ferguson to 2 years imprisonment,
Mr. Milton to 4 years imprisonment, Ms. Monrad to 1 and a half years imprisonment, Mr.
Garand to 1 year and a day imprisonment, and Mr. Graham to 1 year and a day imprisonment. In
light of the sentences imposed on his co-conspirators, sentencing Mr. Houldsworth to any term
of incarceration would create an unwarranted similarity among defendants who are not similarly
situated. In Gall, the Supreme Court upheld the district court's sentence of probation for the
defendant as reasonable even though his co-defendants received sentences ranging from 30 to 35

months. The Court ruled that the district court properly considered "the need to avoid unwarranted similarities among other co-conspirators who were not similarly situated" since the defendant had voluntarily withdrawn from the conspiracy and his co-defendants had not. Gall, 128 S. Ct. at 600. While Mr. Houldsworth and the other defendants committed essentially the same offense conduct, any term of incarceration imposed on Mr. Houldsworth would fail to reflect that he, unlike his fellow co-conspirators, has demonstrated acceptance of responsibility, respect for the law, and has provided substantial assistance to the government.

      **E.**    **There is No Need to Provide Restitution in this Case**

      This Court has ruled that restitution is not applicable in this case. See October 31 Ruling. Based on the foregoing, if the Court chooses to impose a non-Guidelines sentence, the Court should sentence Mr. Houldsworth to one year of probation

**VI.**    **FINE**

      Under 18 U.S.C. § 3571, this Court may sentence Mr. Houldsworth to a fine of up to $250,000. 18 U.S.C. § 3571(b)(3) (2007). In determining whether to impose a fine and, if so, the amount of that fine, the Court must consider the factors set forth in Section 3553(a) as well as the following: (1) the defendant's income, earning capacity, and financial resources; (2) the burden that the fine will impose upon the defendant and anyone financially dependant upon the defendant; (3) any pecuniary loss inflicted upon others as a result of the offense; (4) whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains from the offense; (6) the expected costs to the government of any imprisonment or probation; and (7) whether the defendant can pass on to consumers or other persons the expense of the fine. 18 U.S.C. § 3572(a)(1)-(7) (2007). In selecting an appropriate fine, we respectfully request that the Court, in addition to the Section 3553(a) factors that have been discussed in detail above, consider the following Section 3572 factors in ordering that no fine be paid by Mr.

Houldsworth[19]: (1) his income, earning capacity, and financial resources; (2) the burden that a fine would impose upon him and his family; (3) the fact that he did not obtain any illegal gains from the offense; and (4) the fact that the savings obtained by the government through his substantial cooperation and assistance would offset the cost to the government of any imprisonment or probation imposed. We respectfully submit that these factors warrant a sentence of no fine in Mr. Houldsworth's case, an outcome upheld by courts as a reward for cooperators. See, e.g., United States v. Normand, 02 Cr. 1341 (BSJ), at 12 (S.D.N.Y. Aug. 5, 2005) (sentencing WorldCom co-defendant cooperator to three years probation and no fine); see also United States v. Morrison, 1993 WL 59331, Nos. 92-10121, at *3 (9th Cir. March 5, 1993) (affirming lower court sentence including no fine given in order to reward defendant for his cooperation). If the Court finds that a fine for Mr. Houldsworth is warranted, we respectfully request that only a nominal fine be imposed.

### A.    Mr. Houldsworth's Diminished Income, Earning Capacity, and Financial Resources Warrant A Sentence of No Fine

As reflected in the PSR, Mr. Houldsworth and his family are presently experiencing substantial financial difficulties. (PSR, Ex. 38, ¶ 68.) His income and earning capacity have been severely curtailed as a result of his guilty plea and this criminal proceeding. Following his guilty plea, Mr. Houldsworth was fired from his job and lost most of his retirement savings, which were seized by Gen Re. Furthermore, the recent economic crisis has taken its toll on Mr. Houldsworth and his family's financial well-being. In particular, the present economic crisis has significantly eroded the value of his family's single remaining asset, their home. (PSR, Ex. 38, ¶ 68.) Further, recent changes in the Irish tax code have significantly increased Mr.

---

[19]    In the interest of brevity, we discuss here only those Section 3572 factors relevant to Mr. Houldsworth's case.

Houldsworth's tax obligations, further complicating his ability as the sole wage earner to a family of five, to provide for his family.

**B.     The Substantial Burden a Fine Would Impose Warrants A Sentence of No Fine**

As described in detail above, Mr. Houldsworth is the sole financial supporter of his family, consisting of his wife Ruth and his three teenage children.  Because his earning potential has been severely reduced as a result of his guilty plea, and the fact that most of his savings was seized by Gen Re, any fine would impose an unwarranted and substantial burden upon Mr. Houldsworth and his family.  In addition, we request that the Court consider that he faces potentially significant financial liability in a related civil enforcement action by the Securities and Exchange Commission as well as in at least four shareholder derivative suits on behalf of AIG.  These actions against Mr. Houldsworth arise out of his participation in the LPT transaction that was the focus of this case and expose him to potentially extraordinary, crippling financial liabilities.

**C.     The Fact That Mr. Houldsworth Did Not Personally Profit From the Offense Warrants A Sentence of No Fine**

As described above, Mr. Houldsworth did not intend to and did not profit from this transaction.  Accordingly, a fine is not necessary to satisfy any of the purposes of sentencing.  See U.S.S.G. § 5E1.2(d)(5) (in selecting appropriate fine, the court must consider "civil obligations arising from defendant's conduct").

**D.     The Savings Obtained by the Government As a Result of Mr. Houldsworth's Cooperation Warrants A Sentence of No Fine**

The financial savings to the government that resulted from Mr. Houldsworth's cooperation weigh heavily against the imposition of a fine.  Without his timely and thorough cooperation, the cost to the government in investigating and prosecuting this complex

international fraud would have been substantially greater. We submit, therefore, that the Court

should consider these savings to the government when determining whether to impose a fine.

Courts in this Circuit and elsewhere have considered a defendant's cooperation with the

government when deciding to impose a lesser fine than permitted by the Guidelines. See, e.g.,

United States v. DeRiggi, 893 F. Supp. 171, 185 (E.D.N.Y. 1995) (cooperating beneficiary of

5K1.1 letter received fine at low end of Guidelines range); United States v. BCCI Holdings,

S.A., 3 F. Supp. 2d 31, 33 (D.D.C. 1998) (reviewing United States District Court for the Middle

District of Florida's sentence in which, as a result of defendant's cooperation, the defendant's

sentence was reduced and much of his fine was remitted).

Given the totality of the present circumstances, imposing a fine on Mr.

Houldsworth is not only unnecessary, it would be unjust.

## VII.     CONCLUSION

For all of the foregoing reasons, and anticipated arguments of counsel, Mr.

Houldsworth respectfully requests that the Court impose on him a sentence of one year probation

with no fine.

Respectfully submitted,


By:  /s/ Alex V. Hernandez

Alex V. Hernandez (ct08345)          Larry Byrne, (ct14295)
Pullman & Comley, LLC                Lance Croffoot-Suede, (phv01469)
300 Atlantic Street                  Ulysses S. Smith, (us0127)
Stamford, CT 06901-3522              LINKLATERS LLP
Tel. 203 674 7952                    1345 Avenue of the Americas
Fax 203 363 8659                     New York, NY 10105
E-Mail: ahernandez@pullman.com       Tel.  212 903 9000
                                     Fax  212 903 9100

*Attorneys for Defendant John Houldsworth*

## CERTIFICATE OF SERVICE

I hereby certify that on this date a copy of the foregoing DEFENDANT JOHN HOULDSWORTH'S SENTENCING MEMORANDUM was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Eric J. Glover, Esq.
Assistant United States Attorney
United States Attorney's Office
157 Church Street, 23rd Floor
P.O. Box 1824
New Haven, CT 06510
Tel. 203 821 3700
Fax 203 773 5373
E-Mail: eric.glover@usdoj.gov

*Representing Office of United States Attorney*

　　　　　　　　　　　　　　　　　／s／ Alex V. Hernandez
　　　　　　　　　　　　　　　　　Alex V. Hernandez (ct08345)